Philip W. MARTIN and McCullough Tool Company, a corporation, Plaintiffs,

v.

The FORD ALEXANDER CORPORATION, a corporation, et al., Defendants.

No. 13289.

United States District Court
S. D. California,
Central Division.

March 10, 1958.

672

Lyon & Lyon, by Lewis E. Lyon and R. Douglas Lyon and James E. Harrington, Los Angeles, Cal., for plaintiff.

Elwood S. Kendrick, Fred H. Miller and Roy P. Dolley, Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

For several decades prior to 1945, a difficult problem in the oil industry related to "fishing tools" designed to get out of the casing or pipe in the well pipe or other obstructions. What was sought was an accurate method of locating the point at which pipe is stuck or there is an obstructing object. In well pulling work, where tubing and sucker rods were stuck at some point down in the well at an unknown depth, it became important, in order to part the string of sucker rods and tubing to determine as closely as possible the point where the string was stuck.

A disinterested witness in the case before us, who at the time of testifying was the General Superintendent, General Division of the Producing Department of the Standard Oil Company of California, in charge of drilling, producing, engineering and construction operations in the Counties of Los Angeles, Orange, Ventura and Santa Barbara, California, stated the attempts to meet the problem in this manner:

> "This originally was done in my experience by means of taking the pull on the string and measuring the elongation of the string at the surface with different amounts of pull, and then calculating or approximating the depth where the pipe or the string was stuck."

The method was not very successful, because, as the same witness put it,

> "It was pretty hit or miss. Sometimes we were close, but quite often we missed it by quite a margin."

The patents in suit, Martin 2,530,308, to be referred to as Martin '308, filed September 28, 1945, and issued November 14, 1950, Martin 2,530,309, to be referred to as Martin '309, filed January 15, 1946, issued November 14, 1950, and Brookes 2,550,964, to be referred to as Brookes, filed October 1, 1948, and issued May 1, 1951, all aimed to determine the stuck point in the well. Martin '308 was called "Apparatus for Determining Movability of Members in Wells". The claims in suit are 1, 2, 5, 8, 10, 12, 13, 14, 15, 16 and 17. Of these claims two have been chosen as typical, Claims 10 and 15. They are printed in the margin.[1]

1. "10. In a device having parts adapted to be lowered into a well for determining whether a portion of a tubular member in the well is movable, the combination of: a pair of members connected together in movable relation; means for moving said members down into the well to selected positions; means for connecting each of said members to a different part of a localized portion of said tubular member in the well; and means responsive to relative movement of said members for imparting to an operator outside the well an indication of said relative movement. * * *

"15. In a device for determining which portions of a pipe stuck in a well are movable, an organization adapted to be lowered into said pipe to selected positions, said organization having at least

Martin '309 is called "Device for Determining Relative Movements of Parts in Wells". The claims in suit are 1, 6, 7, 8, 9, 10 and 11. Claims 6 and 10 have been chosen as typical. They are reproduced in the margin.[2] The Brookes patent was named "Device for Determining Point at Which Pipe is Stuck in a Well." All eleven claims are involved. But Claim 5 has been chosen as typical. It is reproduced in the margin.[3]

The issues in this case, instituted by the patentees and their assignee, McCullough Tool Company,—to be referred to as "McCullough"—are the usual ones in patent litigation, validity and in-

one member adapted to engage a selected portion of said pipe and comprising: means operative to move said organization from place to place in the well; means for effecting engagement of said member with a selected portion of the pipe for supporting said member independently of said first-named means so that movement of said selected portion will be transmitted to and cause movement of said member; and electrical movement sensing means in said organization in the well, adapted to produce an electrical signal in consequence of said movement of said member, and means at the surface of the ground connected to said sensing means and adapted to indicate said signal." (Patent No. 2,530,-308, Nov. 14, 1950, P. W. Martin, Exhibit 1. See post, p. 690.)

2. "6. In a device of the character described, for obtaining information from a well of movement of parts in the well, the combination of: a pair of members connected together in movable relation and adapted to be lowered into a well; means for connecting each of said members to separate parts in a well so that movement of said parts will produce relative movement of said members; means forming an electrical circuit having a winding support in close relation to one of said members; an armature disposed in movable relation to said winding; means for producing a fluctuating current flow in said circuit; means connecting said armature and one of said members so that relative movement of said members will cause relative movement of said armature and said winding and thereby change at least one of the characteristics of said current flow; and means at the top of the well adapted to act in response to said change in said current flow and indicate said relative movement of said members. * * *

"10. In a device of the character described, for use with a circuit which extends down into a well and means for producing a fluctuating electrical flow in said circuit: a pair of members connected together in movable relation and adapted to be lowered into the well; means operable to produce such engagement of said members with separate parts in the well that relative movement of said parts will cause relative movement of said members; and variable inductance means arrange for coupling to said circuit, said inductance means having relatively movable elements, at least one of which elements comprises a winding, and one of said elements being connected to one of said members and another of said elements being connected to the other of said members, to effect relative movement of said elements and variation of said inductance means in consequence of relative movement of said members." (Patent No. 2,530,309, Nov. 14, 1950, P. W. Martin, Exhibit 2. See post, p. 698.)

3. "5. In a device for determining the point at which a pipe is stuck in a well, the combination of; an assembly adapted to be lowered into the pipe, said assembly having space expansible members comprising bow springs to frictionally engage the wall of the pipe and vertically extending means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe, one of said members being rotatable relative to said vertically extending means; conductors extending in proximity to said assembly and forming an electric circuit extending from the top of the well to said assembly; means producing an electrification of said circuit; electrical control means forming a part of said assembly and connected to said vertically extending means and one of said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means at the top of the well coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members." (Patent No. 2,550,964, May 1,

fringement.[4] To these have been added certain special defenses: invention by another,[5] fraud practiced upon the Patent Office which calls for a denial of any relief in a court of equity,[6] and misuse of the patent through restrictive agreements, which render the patents unenforceable.[7]

## I

### Certain Accepted Principles

It has become common practice for every current opinion on patent law to discuss the impact of the decisions of the Supreme Court in certain recent cases which establish a more rigid standard for determining patentability.[8] It is unnecessary to do this here because the Court of Appeals of this circuit has stated repeatedly that the courts of this circuit are committed

"to the rigid standard of invention [of these cases]."[9]

However, the promulgation of these tests has not affected other well-known principles of patent law which are important in the determination of the issues in this case. Stated briefly, they are:

■ Patents simultaneously issued must be construed together in order to determine whether there is double patenting, or whether the second patent merely embodies added features not contained in the first, and if this was done by the inventor or by direction of the Patent Office. The second, the continuing patent, may generally describe, without claiming, the first.[10] The principle has been well stated by the Court of Appeals for the Eighth Circuit:

"But one who makes several patentable inventions that result in a new and useful machine or process, or both, may have as many separate valid patents as he makes patentable inventions. His is the option to secure all these inventions by a single patent, or by many patents, and the fact that he describes all of them in his application or specification for an earlier patent to secure one or more of them, does not invalidate a subsequent patent to him for those inventions there described but not claimed. * * * And a patent for an invention does not avoid a later patent for an improvement thereon nor does a patent for an improvement avoid a later patent for the invention on which the improvement is made. Thomson-Houston Elec. Co. v. Ohio Brass Co., [6 Cir.], 80 F. 712, 724, 725, 726, 26 C.C.A. 107, 119, 120, 121. The sum of the whole matter is that while an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former it does not invalidate a later patent to

---

1951, N. Brookes, Exhibit 3. See post, p. 704.)

4. 28 U.S.C.A. § 1338.

5. 35 U.S.C.A. § 102(a) (b) and (f).

6. International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 135–136, 56 S.Ct. 701, 80 L.Ed. 1085; Hazel-Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 250, 64 S.Ct. 997, 88 L.Ed. 1250; Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 803, 814, 65 S.Ct. 993.

7. 35 U.S.C.A. § 282(1); McCullough v. Kammerer, Corp., 9 Cir., 1948, 166 F.2d 759; Chamberlin v. Clark Bros., D.C. Cal.1951, 96 F.Supp. 498, 500.

8. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S.

545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

9. Moist Cold Refrigerator Co. v. Lou Johnson Co., 9 Cir., 1957, 249 F.2d 246, 253; Bergman v. Aluminum Lock Shingle Corp., 9 Cir., 1957, 251 F.2d 801. And see, Goldman v. Bobins, 7 Cir., 1957, 245 F.2d 840.

10. Benjamin Electric Mfg. Co. v. Dale Co., 2 Cir., 1907, 158 F. 617, 619–620; Century Electric Co. v. Westinghouse Electric & Mfg. Co., 8 Cir., 1911, 191 F. 350; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 1932, 54 F.2d 900, 902; Buono v. Yankee Maid Dress Corp., D.C.N.Y.1934, 7 F.Supp. 793, 794, 795.

him for a distinct, different and separable invention whether generic or specific, whether an original machine or process, or both, or an improvement thereon which is not actually claimed or secured by the earlier patent." [11]

This principle has special importance in this case because Martin '309 states specifically that it

"is a continuation-in-part of * * co-pending application, Serial No. 619,242, filed September 28, 1945, for Method and Apparatus for Determining Movability of Members in Wells."

And it was issued on the same day as Martin '308.

■■ It is axiomatic that a patent must show novelty, utility and invention.[12] And novelty may consist in placing an old device to a new use which produces different or non-analogous results, not anticipated in the art.[13]

■ A wider range of equivalents is permitted in a patent of a pioneer character.[14] The Supreme Court in a noted case has defined the word "Pioneer" in this manner:

"This word (pioneer), although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are the one to Howe, of the sewing machine; to Morse, of the electrical telegraph; and to Bell, of the telephone." [15]

There has been no deviation from this interpretation of the meaning of the word since.[16]

---

11. Century Electric Co. v. Westinghouse Electric & Mfg. Co., supra, Note 10, 191 F.2d at page 353.

12. Hycon Mfg. Co. v. H. Koch & Sons, 9 Cir., 1955, 219 F.2d 353, 356.

13. Ansonia Brass & Copper Co. v. Electrical Supply Co., 1892, 144 U.S. 11, 18, 12 S.Ct. 601, 36 L.Ed. 327. See, Potts v. Creager, 1895, 155 U.S. 597, 606–607, 15 S.Ct. 194, 39 L.Ed. 275.

14. Westinghouse v. Boyden Power Brake Co., 1898, 170 U.S. 537, 561–562, 18 S.Ct. 707, 42 L.Ed. 1136; Cimiotti Unhairing Co. v. American Fur Refining Co., 1905, 198 U.S. 399, 406–407, 25 S.Ct. 697, 49 L.Ed. 1100.

15. Westinghouse v. Boyden Power Brake Co., supra, Note 14, 170 U.S. at pages 561–562, 18 S.Ct. at page 718.

16. Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 1946, 157 F.2d 725, 729; Walker on Patents, Deller Ed., 1937, §§ 247, 471. Indeed, the present tendency is to give the full benefit of liberal equivalence to worthy patents which *may not be in the pioneer class.* In a leading case the Supreme Court has stated:

"One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. * * * *The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results,* Imhaeuser v. Buerk, 101 U.S. 647, 655, 25 L.Ed. 945, *although the area of equivalence may vary under the circumstances.* * * * What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does*

■■ In interpreting the claims of a patent we are not limited to the structure described.[17] Nor is the mere reading of the claims upon a device determinative of infringement unless there is substantial identity of function, means and result.[18] Identity of operation of a device is not conclusive unless it is arrived at in the same operative manner.[19]

## II

### Pioneer or Basic Inventions

#### A. The Problem

■ In the light of these principles and the presumption of validity which attaches by Congressional fiat to a patent,[20] it is evident that we have here invention of a primary character.

We have already alluded to the problem which confronted the oil industry and the manner in which the patented devices met it. Attesting to the successful solution of the problem, in addition to the testimony already alluded to given by a high executive of one of the large companies, Standard of California, is the fact that the executive of one of the minor companies, Hancock, stated that

his company alone may be saving over a million dollars a year by the use of McCullough tool. This witness,—who, at the time he testified, was Vice President and Manager of Production of his Company, and had risen from the ranks beginning as a "roust-about" forty-two years before,—very succinctly stated the difficulties which the oil industry had in salvaging work which only Martin solved.

In abandoning wells and cleaning up leases, it was necessary to remove from the well tubing and casing. To achieve this, in the witness' own words,

"We would rig up blocks and lines, and pull stretch on it, and from pulling the stretch we would determine where we could either rip it or shoot it, depending upon what the Mining Bureau required. And each string of pipe that was in from the center, the inside string, we would try to recover from the show of the next string of pipe. Most of it in those days was cable tool, and had more than one string of pipe in them."

not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 607–609, 70 S.Ct. 854, 856, 94 L. Ed. 1097. (Emphasis added.)

17. "Patents are not limited to the structure described and shown, but the invention may be embodied in various forms. A transposition or rearrangement of the parts as set forth in a patent is an embodiment of the patented invention and does not avoid infringement un-

less form, location of sequence is essential to the result or to the novelty of the claims." Apex Electrical Mfg. Co. v. Maytag Co., 7 Cir., 1941, 122 F.2d 182, 187. (Emphasis added.)
And see, Borg-Warner Corp. v. Mall Tool Co., 7 Cir., 1954, 217 F.2d 850, 853.

18. Grant v. Koppl, 9 Cir., 1938, 99 F.2d 106, 110; Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 1938, 106 F. 2d 644, 650; McRoskey v. Braun Mattress Co., 9 Cir., 1939, 107 F.2d 143, 147; and see, Braun, Inc. v. Kendall-Lamar Corp., 2 Cir., 1941, 116 F.2d 663, 665; Apex Electrical Mfg. Co. v. Maytag Co., supra Note 17; Schnitzer v. California Corrugated Culvert Co., 9 Cir., 1944, 140 F.2d 275, 276; Pointer v. Six-Wheel Corp., 9 Cir., 1949, 177 F.2d 153.

19. John Waldron Corp. v. Equitable Paper Bag Co., Inc., 3 Cir., 1939, 106 F.2d 724; Air Devices, Inc. v. Air Factors, Inc., 9 Cir., 1954, 210 F.2d 481, 482.

20. 35 U.S.C.A. § 281.

To recover casing or tubing, again using his words:

"We had no means except to pull stretch and the rule of thumb in the early days was a half-inch of stretch to 100 feet of pipe that you were pulling on, and then you would calculate it out, and try shooting or ripping at that point. If you couldn't get it loose there, why, you would come on up the hole."

In the view of the witness, not until the Martin invention was the problem solved successfully.

The large sums received by the assignee, McCullough, and by Martin, the inventor, from the operation of the tool furnish added proof of the commercial success of the device.[21] Commercial success means nothing if there be no invention.[22] But we have more than that here.

As already appears, for many decades the problem of locating stuck pipe in oil wells had baffled the industry. Then came the patented devices. In retrospect they

"seem simple and such as should have been obvious to those who worked in the field." [23]

The fact remains, however, that they did not so occur to any one else. And Martin is entitled to the full scope of an invention which met very successfully a difficult problem, limited, of course, to what is claimed in his patents. As stated in a noted case:

"The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore,

21. "Commercial success is really a make-weight where the patentability question is close." Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235.
And see, Goodyear Tire & Rubber Co., Inc., v. Ray-O-Vac Co., 1944, 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721. Between 1946 and September 1, 1957, according to the books of McCullough, the operation of the device has brought to the Company a total income of $5,-250,247.82. Of this amount, sales in the United States amounted to $4,689,361.50, sales in Canada to $345,208.80, and sales in foreign countries other than Canada, amounted to $215,677.52. During this period, Martin has received as royalties $259,557.35.

22. McLean v. Ortmayer, 1891, 141 U.S. 419, 428–429, 12 S.Ct. 76, 35 L.Ed. 800; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; Leishman v. General Motors Corp., 9 Cir., 1951, 191 F.2d 522; Jungersen v. Ostby & Barton Co., supra, Note 21, 335 U.S. at pages 567–568, 69 S.Ct. at page 272; Container Corporation of America v. M. C. S. Corp., 9 Cir., 1957, 250 F.2d 707.
"But commercial success without invention will not make patentability."

Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162.

23. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co., supra, Note 21, 321 U.S. at page 279, 64 S.Ct. at page 594. Judge Learned Hand expressed the same idea in almost identical language many years ago, in Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 1927, 18 F.2d 66, 68. We may well apply to Martin and Brookes the words of The Barbed Wire Patent, Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co., 1892, 143 U.S. 275, 283, 12 S.Ct. 443, 446, 36 L.Ed. 154:
"In the law of patents *it is the last step that wins.* It may be strange that, considering the important results obtained by Kelly in his patent, it did not occur to him to substitute a coiled wire in place of the diamond shape prong, but evidently it did not; and to the man to whom it did ought not to be denied the quality of inventor. There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of the series of inventors, all of whom were groping to attain a certain result, *which only the last one of the number seemed able to grasp.*" (Emphasis added.)

that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—'He can claim nothing beyond them.' "[24]

The problem, whether fishing for objects in the well or spudding in, was to locate a definite spot where the obstructing object or the pipe was stuck. Martin thought that if he could provide a device which could be lowered within the stuck pipe and by which men working at the top of the well, could determine whether the portion of the pipe adjacent to the device in the well moves or stretches when a pull is applied to the upper end of the pipe, the problem would be solved. At the stuck point and below it the device would produce no indication of movement or stretch in the pipe, which would mean that the point to which the pipe is stuck in the well had been reached.

### B. The Solution

In order to achieve the result, Martin proposed the placing of a sensing unit in a well in connection with an isolated section of the pipe so as to determine the condition existing at that point and means to transmit that fact to the operator. He obtained a direct connection with the pipe through the use of two anchor members. And through the slip connection between those anchors which were connected to move freely with reference to each other, he determined whether or not in that isolated section of pipe there was relative movement between those members. Martin '308, in one of the typical claims, Claim 10, describes the invention in, substantially, this manner:

(1) A pair of members connected together in movable relation; (2) Means for moving said members down into the well to selected positions; (3) Means for connecting each of said members to a different part of a localized portion of said tubular member in the well; and (4) Means responsive to relative movement of said members for imparting to an operator outside the well an indication of said relative movement.

Martin's application for the patent was dated September 28, 1945. In his '309 application which was made three months after the first application, and which, as already stated, was denominated "a continuation-in-part" of the other application, he provided the means of best achieving the result sought by using an inductance type operating mechanism utilizing the inclined pole face which enables him to determine relative movement between the two anchor members in stretch or in torque. In Martin '309, he described this in one of the typical claims, Claim 11, which has five elements:

(1) A pair of members connected together in moveable relation and adapted to be lowered into a well; (2) Means for moving said members in the well to a position adjacent to selected portion of a tube in said well; (3) Means operating independently of said first named means to support said members; (4) Means operating in consequence of relative movement of said selected portion of said tube to produce relative movement of said members; and (5) Current control means comprising a variable inductance means arranged to be coupled to said circuit and connected to said members so that relative movement of said members will cause a change in the inductance of said variable inductance means, as an indication of movement of said selected portions of said tube. In essence, the '309 patent describes the same structure but utilizes a different sensing system, i. e., two magnets with a sensing device thereon exposed between them which provides a magnetic type of pickup. This is connected at the surface to the metering device so that the change

24. Motion Pictures Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871.

And see, Mercoid Corp. v. Mid-Continent Co., 1944, 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376.

in the electrical characteristics occasioned by the separation or rotation of two magnetic elements in the sensing device is recorded on the instrument. The Brookes patent does not use the magnetic form of holding device for securing the sensing means to the localized section of pipe. Instead, it uses as a sole supporting means two bowspring clamping devices which are in engagement throughout the length of the travel of the detector into the well. The sensing device achieves the same result of measuring the relative movement of the pipe between the two clamping devices. The method of operation of the Brookes patent is described in one of the typical claims, Claim 5, in this manner:

(1) An assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to frictionally engage the wall of the pipe and means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; (2) Conductors forming an electric circuit extending from the top of the well to said assembly; (3) Means producing an electrification of said circuit; (4) Electrical control means connected to said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and (5) Electro-responsive indicating means at the top of the well coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

The plaintiffs introduced a tool manufactured according to the teachings of each of the patents in suit. Demonstrations were conducted in court and described by witnesses under conditions simulating an oil well and indicating that they were operative and achieved the results claimed. The defendants conducted like experiments with tools of their own making according to the teachings of these patents in order to demonstrate that they were inoperative. Having witnessed all demonstrations and having heard the comments of the demonstrators, I am satisfied that the patented devices described in Martin '308, Martin '309 and Brookes are operative devices. More, Martin '308 and '309 may, for all intents and purposes, be considered one and the inventor was free to combine the elements they contain in one tool.[25]

A fourth tool was also introduced,—the commercial tool actually sold by McCullough known as the "Magna-Tector". Concededly it contained some additions not contained in the others. But it is a fundamental principle of law that one who has a basic invention may make changes in it in order to increase its practicality without losing the benefit of his generic invention. The most noted example of this occurred in the famous Telephone Cases,[26] in which it was contended that Bell's invention of the telephone was inadequate in that Bell had never

> "actually transmitted telegraphically spoken words so that they could be distinctly heard and understood at the receiving end of his line."[27]

25. See cases cited in Note 11.

26. The Telephone Cases, Dolbear v. American Bell Tel. Co., 1888, 126 U.S. 1, 8 S. Ct. 778, 782, 31 L.Ed. 863.

27. The Telephone Cases, supra, Note 26, 126 U.S. at page 535, 8 S.Ct. at page 782. In a later case, which came from the Ninth Circuit, the Court said:
 "It is not necessary, in order to sustain a generic patent, to show that the device is a commercial success. The machine patented may be imperfect in its operation; but if it embodies the generic principle and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough." Hildreth v. Mastoras, 1921, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112.

However, the court gave him the full benefit of a primary invention, saying:

"* * * in his specification he did describe accurately, and with admirable clearness, his process,—that is to say, the exact electrical condition that must be created to accomplish his purpose,—and he also described, with sufficient precision to enable one of ordinary skill in such matters to make it, a form of apparatus which, if used in the way pointed out, would produce the required effect, receive the words, and carry them to and deliver them at the appointed place. *The particular instrument which he had, and which he used in his experiments, did not, under the circumstances in which it was tried, reproduce the words spoken so that they could be clearly understood; but the proof is abundant, and of the most convincing character, that other instruments, carefully constructed, and made exactly in accordance with the specification, without any additions whatever, have operated, and will operate successfully.* * * *

"The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection; it is enough if he describes his method with sufficient clearness and precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation. This Bell did."[28]

For the same reason, an improver of a basic invention

"without a license is an infringer, and may be sued as such."[29]

A combination patent stands as a unit. Where the result achieved is the same, the addition of elements to a patented combination by an infringer, even if an improvement, will not avoid infringement.[30] So the fact much stressed at the trial and at the argument that the McCullough commercial device embodied features not contained in any of the three patents carries little weight. In the main, the commercial device follows the teachings of the patents in suit with such additions as practical experience commanded and which were open to the inventor under the teachings of the Telephone Cases.[31]

### C. Method of Operation

In one of the catalogues in the record, the McCullough commercial tool is described in this manner as to function and operation:

"The function and purpose of this tool is to locate the point at which pipe is stuck in a well, or the lowest point that it is free, and from which it can be recovered. It can also be used to ascertain strain or compression at any given point in a string of casing, tubing or drill pipe above the stuck point. * * * When used in drill pipe, the most outstanding value is that the stuck point can be located quickly, so that the pipe can either be cut-off, shot or backed-off at the lowest possible point before enough time has elapsed to allow the pipe to stick farther up the hole. All of the same advantages exist when the Magna-Tector is used for testing tubing, and in addition the operator will also be able to definitely ascertain whether or not the tubing is stuck above or below a packer or tubing hanger."

28. The Telephone Cases, supra, Note 26, 126 U.S. at pages 535–536, 8 S.Ct. at page 782.

29. Temco Electric Motor Co. v. Apco Mfg. Co., 1928, 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298; United States v. Line Material Co., 1948, 333 U.S. 287, 291, 68 S.Ct. 550, 92 L.Ed. 701.

30. Aluminum Company of America v. Thompson Products, 6 Cir., 1941, 122 F. 2d 796, 799; Haynes Stellite Co. v. Chesterfield, 6 Cir., 1927, 22 F.2d 635, 638.

31. The Telephone Cases, supra, Note 26.

As demonstrated in the courtroom, the Magna-Tector contains two electro-magnets between which there is a sensing element which senses either torque or stretch. The device aims to find whether the pipe is free by stretch or torque. The cable through which the tool is lowered is attached to a truck on which there is the power supply to energize the electro-magnets and also the variable conductors. The meter at the top indicates whether the pipe is stuck or free. When the pipe is stretched the meter moves to the extreme right, indicating that the pipe is moving or elongating between the two magnets. When the tension is let off the meter comes back to the same place again. In effect, with the Magna-Tector at the bottom of the well when the pipe is stretched from the surface and its stretch reaches down to the Magna-Tector, the pipe is free and if the stretch does not reach the Magna-Tector the pipe is stuck. The depth at which the device is in the well is measured with a counter. So that from the length of the wire line run into the well the location of the tool is determined.

In torque, when pressure is applied, if the indicator meter moves back and forth it means that the pipe is turning in the area. When the weight is taken off, the indicator comes back to the starting point. When the pipe is stuck there is no motion on the meter, whether the pipe is stretched or torqued.

At the lower end of the tool there is a collar finder and the filter circuit to shoot the string shot. These two elements have been added to the Martin patents. They are not operated at the same time as the torque is. They are hung on the same handle and they are run on the same run so that more than one operation can be performed in the well in one run. In order to do this, the power supply to which the tool is attached has two sources of power, one direct current, the other alternating current. When the point at which the pipe is stuck is found, either by stretch or torque, a charge of explosives is low-ered to the nearest point in the pipe or collar. Then the alternating electrical conductor is inserted into the top of the tool, and the explosives are shot off in the pipe to secure back-off. In this manner there is economy of operation. For immediately after locating the stuck point of the pipe the operation which frees it is also performed with no waste of time and little additional labor and the use of practically the same equipment.

The advantage of giving the two services is attested by the fact that the defendant corporation in one of its early catalogues, 1949–1950, advertised both services under the name of "Dia-log Free Point Indicator and String Shot Back-Off Service." There is in the record a reproduction of a full page advertisement which appeared in several nationally known trade publications, 1949–1950, of the oil industry advertising the services together. That it was possible by little change to adapt the McCullough tool to perform both operations is a tribute to Martin's inventive ability.

### III

#### Combination Patents

Much of the evidence of the defendants and the argument seems to have been directed to proving that the basic element of the patents in suit is a strain gauge which has been long known to the art and was contained in literature and in patents dealing with the subject. The difficulty with the argument is that, while a strain gauge is employed, other elements are added to it in order to achieve a combination which is an entity in itself and which produces a result not thought of before. It is easy to make what has long been called in patent law a "mosaic" defense,—which consists of an attempt to show that, like the tesselated or inlaid work called "mosaic", the elements of the patented combination were old and known. But just as a "mosaic" can achieve artistic unity through use of bits, cubes or squares of stone, glass or enamel, so in the law of

patents, the use of an old device or devices to achieve a new, different or non-analogous purpose is invention. As stated by the Supreme Court:

"Indeed, it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device *de novo*. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to anyone before."[32]

■■■ In the law of patents we should eschew the tyranny of words. It is an accepted axiom that "a patentee is at liberty to supply his own dictionary".[33] This is indicative of the fact that the

courts in interpreting patents are endeavoring to give effect to the meaning of the claims,—whether the terms used by the inventor were ordinary words or words which had a meaning other than the meaning attributed to them by lexicographers, but which was apparent from the context in which the inventor used them.[34]

The defendants would have us nullify the invention because of their contention that it teaches nothing more than the use of a strain gauge to achieve the desired result. Even if this were all, it would still be arguable that Martin put a strain gauge to a different and non-analogous use, which amounted to invention.[35] But the fact remains, as the analysis just given illustrates, that he used what might be called a "strain gauge" in combination with other elements. Charts offered in evidence by the defendants themselves illustrating Claim 10 as to Martin '308, Claim 11 as to Martin '309 and Claim 2 of Brookes indicate the presence of other elements. And at the argument, counsel for the defendants, in referring to the prior art, conceded that the patented combination in the three patents in suit consisted of many elements, but tried to trace every one of the elements to the prior art. His references are given in the margin.[36]

32. Potts v. Creager, 1895, 155 U.S. 597, 607–608, 15 S.Ct. 194, 198, 39 L.Ed. 275.

33. Kennicott Co. v. Holt Ice & Cold Storage Co., 7 Cir., 1916, 230 F. 157, 160; Jones v. Sykes Metal Lathe & Roofing Co., 6 Cir., 1918, 254 F. 91, 96; Cincinnati Rubber Mfg. Co. v. Stowe Woodward, Inc., 6 Cir., 1940, 111 F.2d 239, 242.

34. See the writer's recent opinion in Elrick Rim Co. v. Reading Tire Machinery Co., D.C.Cal.1957, 157 F.Supp. 60, where the validity of a process patent was attacked because of alleged improper use of the word "emulsion". See, Tubular Service Engineering Co. v. Sun Oil Co., 5 Cir., 1955, 220 F.2d 27, 31, in which the Court had this to say of an attempt to circumscribe a patent by attaching to some of the elements of the device *designations that the inventor did not use in his claims*:

"We think that neither the express language of the claims, nor the doctrine of equivalents, may be so narrowly circumscribed as to impose limitations and restrictions on the patent, such as are inherent in acceptance of appellants' *'centering device' and 'weak feeler spring' defenses*, that appellee, by omitting any express reference thereto in claiming its monopoly, undoubtedly sought to avoid." (Emphasis added.)

35. See cases in Note 32.

36. We quote from the record:
"The defendants contend that that combination comprised the lowering cable, pipe stretched or torques, detecting means, connecting means between the pipe, and the detecting means, electronic or electrical conductors, surface circuitry and indicating means.
"The defendants contend that that entire combination is to be found in the

So it would serve no useful purpose to analyze in detail the voluminous art cited and referred to in the argument. Even the *best references* do not anticipate the invention.

## IV

### The Best References

Sweet, U.S. No. 2,078,426, issued April 27, 1937, was a method for recovering casing from a well. It provided a cumbersome method of lowering a string of pipe into a well

"carrying a tool capable of gripping the interior of the casing to connect the pipe therewith, the tripping or actuating of the tool, applying a longitudinal force to the casing through the medium of the pipe and gripping tool, noting whether or not the force thus applied varies the tensile strain on the casing to determine if the said tool is above or below the point at which the casing is caught, locating the point of fixation of the casing by actuating said tool and applying the longitudinal force at different vertically spaced points, cutting or parting the casing immediately above the point of fixation of the casing, and then removing the freed portion of casing from the well."

It contained none of the simplicity and efficacy for detecting the stuck point of the tool involved here.

E. L. Johnston, U.S. No. 2,300,384, issued on October 27, 1942, was entitled "Method of Locating Stuck Pipe in Wells". He stated one of the objects of his invention to be

"to anchor a detector unit to the inside of a stuck pipe in a well bore and to then pull on the pipe to determine whether the pipe at the elevation of anchorage is stretching due to such pull.

"Another object of the invention is to exert a pull upon a stuck pipe in a well bore and determine the length of pipe which is stretching due to such pull so as to locate the elevation at which the pipe is stuck in the well.

"Another object of the invention is to exert a simultaneous pull upon an anchoring device in a pipe and upon the pipe itself to determine whether the pipe moves at the elevation of anchorage."

Crites patent, U. S. 2,250,703, the Ennis patent, U. S. 2,228,623, the Ruge patent, U. S. 2,216,975, 2,359,072 and 2,392,-293, the Kinley patent, 1,654,819, the Lamberger patent, 2,275,532, the Vacquier patent, U. S. 2,281,960, the Sweet patent, U. S. 2,078,426, the Johnson patent, 2,300,384, the Brandon patent, 2,-322,343, the Silverman patent, 2,422,806, —the Silverman patent was a strain gauge used in an oil well for measuring the amount of strain on drill collars. This patent had attachment members used in an oil well, it had everything, your Honor please, except the detachable holding means of the plaintiffs.

"Now, the detecting means used here by everyone are admittedly old, and they are also disclosed in the Crites patent, U. S. 2,250,703, the Ennis patent, 2,228,-523. * * *

"In other words, magnetostrictive strain gauges, resistance-type strain gauges, and variable inductance type strain gauges, are there all made equivalent for the purpose of detecting movement of pipe in a well, and it was demonstrated in the court, your Honor, by means of the model EP of the Ruge patent, and the model BY of the Howes patent that all of those devices are equivalent for detecting movement of pipe in a well.

"The use of belly springs as a holding structure is disclosed in the Kinley patent of springs, No. 1,654,819; the Vacquier patent, No. 2,281,960, Nos. 18, and the Brandon patent, No. 2,322,343. * * *

"Many, many methods are disclosed for attaching devices to structures for detecting movements or strain. Mechanical gripping means are disclosed in the Sweet patent, U. S. Patent No. 2,078,426. The dogs or slips are disclosed therein Item 21.

"The Lamberger patent, U. S. No. 2,-275,432, screws. The Johnston patent, No. 2,300,384, slips. The Ruge patent, U. S. 2,392,293, set screws."

It did not contain the means for detecting with accuracy the location of the stuck point of any of the three patents in suit.

 There is no evidence that the teachings of either Sweet or Johnston were reduced to practice before Martin appeared in the field, or that anyone in the oil industry familiar with the problem ever heard of, or saw used, a device of either character, although Sweet's application was filed July 11, 1934, and Johnston's July 29, 1940. More, the Johnston patent was cited as a reference in both Martin applications. As it was rejected by the Examiner

"each is presumed to be valid as against those cited against it."[37]

As to Ruge, U.S. No. 2,316,975, issued April 20, 1943, it may be said that it was merely an electrical gauge to be used on a disc to test surface strains. To make it perform the function of the patents in suit one would have to add to it a slip joint to permit two mounted anchor members to be used in connection with an isolated piece of pipe in an oil well.

 It follows that the claims sued on in each of the patents are valid, and not anticipated in the prior art.

## V

### Other Defenses

#### A. Invention by Another

 I believe that the strong feeling that manifested itself at the trial of this case stems from the contention of the defendants that whatever novelty there

be in the Martin patents was disclosed to McCullough by Edgar T. Howes. In conducting negotiations with McCullough for the acquisition by it of a company with which he was connected, the Magnatest Corporation, in April, 1945, Howes presented to them a sketch of a tool that might be constructed and operated from a wire truck in order to locate stuck drill pipe. A contract for a license under a pending patent application "for stress measurement" was tendered, but the negotiations were not completed, the offer being rejected by McCullough by letter dated May 23, 1945. What Howes, who is not a party to this suit, presented was the suggestion of an idea and not the description of a completed tool. It was, at most, an embryonic idea. It did not describe the device which Martin and Brookes ultimately developed. Patentability does not attach to ideas but to their practical embodiment in completed inventions.[38] The Court of Appeals for the Eighth Circuit has stated:

"Clearly, Stocke had the idea of obstructing the throat (of a machine) to prevent errors, but ideas are not patentable. It is the means, or thing by which they may be accomplished that is within the law."[39]

 As Howes' idea had not passed the stage of an abstract, unrealized suggestion and could not have been patented, it cannot be used as an anticipatory disclosure that would support a defense that Martin himself did not invent the device.[40]

37. Indiana & Illinois Coal Corp. v. Clarkson, 7 Cir., 1937, 91 F.2d 717, 721.

38. Walker on Patents, Deller Ed., 1937, § 21.

39. Measuregraph Co. v. Grand Rapids Show Case Co., 8 Cir., 1928, 29 F.2d 263, 275; see, Dyer v. Sound Studios of New York, 3 Cir., 1936, 85 F.2d 431, 432.
"A mere idea, of course, is not patentable, and the abandonment of a mere experiment to put an idea into concrete form and practical operation will constitute no impediment to a future patentable disclosure." Indiana & Illinois Coal

Corp. v. Clarkson, supra Note 37, 91 F. 2d at page 721.

40. 35 U.S.C.A. § 102(f). As stated in a famous case:
"The invention or discovery relied upon as a defense, must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the

## B. Fraud in the Patent Office

 Certain other defenses may be disposed of with brevity. There is the charge that the patent is unenforceable because of fraud practiced on the Patent Office.[41] The entire basis for the contention is the presence in the file wrapper of application '309 of a statement in some affidavits secured by counsel for McCullough to the effect that the affiants knew of no apparatus seeking to achieve the same results, reading:

"To the best of my knowledge and belief, there is no other device or instrumentality other than the Magna-Tector which is available to the oil industry with which the freeze point of pipe can be located with a high degree of accuracy."

The evidence shows that while representatives of McCullough solicited these affidavits, in forwarding them the attorney for the company stated that he had been informed by a member of the McCullough staff that the witness was willing to sign the affidavit and suggested that in case the affidavit *did not* conform to the facts, the witness was free to make such changes as he desired or have another affidavit prepared. In at least one instance that was actually done and the clause was eliminated.

Some of these affidavits were presented to the Patent Office on July 6, 1949, by the attorney in charge of the two Martin applications. Others were filed later; the latest appears to have been filed on August 20, 1949. However, the patents were not issued until November 14, 1950. And there is no evidence that the affidavits had the effect of expediting the granting of the applications which had been pending for years or that they served to overcome any specific objection which the Examiner had to the issuance of the patents or of the claims in suit. More, as I stated at the trial, the paragraph has so many qualifying phrases,—such as "to the best of my knowledge and belief", "Located with a high degree of accuracy",—that it could be characterized, in the language of the late Theodore Roosevelt, as embodying "weasel words". Nor is there a showing that the person who caused the affidavit to be filed *did not* actually believe that the experiment he may have seen conducted with the experimental device of the defendants in May and June 1949 was in *any way* as successful as, or comparable to, the device for which Martin claimed invention. In a matter of this character, as in all matters relating to fraud, there must be *scienter*, i.e., knowledge on the part of the person that what he is stating is false.

 The frauds which call for denial of enforceability in patent law must be of the type which imply willfulness. Here we do not have even a showing of that type of irresponsible utterance which is, at times, identified with willfulness.[42]

---

point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires not conjecture, but certainty. If the question relate to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility." Coffin v. Ogden, 1873, 18 Wall. 120, 124, 85 U.S. 120, 124, 21 L.Ed. 821. (Emphasis added.)

The Howes attempts were experimental and speculative. Martin and Brookes produced *real* inventions. See, Pointer v. Six-Wheel Corp., 9 Cir., 1949, 177 F. 2d 153, 157–158.

"It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, *nor actually used, for the performance of such functions*." Topliff v. Topliff, 1892, 145 U.S. 156, 161, 12 S.Ct. 825, 828, 36 L.Ed. 658. (Emphasis added.)

41. 35 U.S.C.A. § 282(1). And see, cases cited in Note 7.

42. United States v. Murdock, 1933, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381. See, Marks v. Polaroid Corp., 1 Cir., 1956, 237 F.2d 428, 436.

## C. Misuse of Patent

■ Nor is there any substance to the defense that there has been misuse of the patent through combining of unpatented articles with the patented articles and forcing the purchase of both,—the type of restrictive agreement and misuse of the patent monopoly which courts have in the past deemed sufficient to deny enforceability.[43]

In the original agreement dated September 9, 1939, between Martin and McCullough, a clause was inserted which read:

> "Sixth: Licensee agrees that he will not manufacture and/or rent and/or use and/or sell any device or devices that are competitive in their uses or purposes to those herein referred to or that the Licensor may develop and/or patent with the consent of the Licensee."

This clause was never put into effect. And an amendment to the agreement dated December 31, 1941, which eliminated it, was not made to legalize a possible illegality of the contract, but to formalize by writing what had actually been the practice since the inception.

Because of the nature of the patented devices, McCullough sells (in the United States) its services in conjunction with the employment of its own men to operate them upon wire trucks which they own and which are not patented. These wire trucks are used to lower the instrument into the well and to energize the device. But the evidence in the record shows that McCullough has made these same services available to other companies, competitors in the same field, which are permitted to use their own wired trucks. It was testified that when this is done the McCullough crew must carry, often by airplane, as much as 500 pounds of electrical equipment. For this reason, the price for the service is the same. It is argued that because of this the competitive device of the defendants (the "Free-Point-Indicator") cannot well compete with the device of the plaintiffs (the "Magna-Tector") unless the defendants have at various oil fields trucks of the same type. It is insisted that an oil company seeking the service is compelled to take McCullough's because they have the equipment, and they offer it at a combination price which is advantageous to those seeking the service.

The argument is somewhat contradictory. It is argued, on one hand, that oil operators are forced to accept a fixed price for services, whether they use the wiring trucks or not and, on the other hand, that McCullough's competitors are at a disadvantage because McCullough has available these trucks at all points. As stated at the trial, the insistence on the operation of a tool of this character by one's own employees has many economic and business reasons to commend it. To allow employees to operate on someone else's trucks might raise very complicated legal questions in states like California which have stringent Employer's Liability Laws.[44] For the relationship existing between the employer and employee may change when an employee performs work for an independent contractor or is loaned to another employer.[45]

43. See cases cited in Note 6. And see, Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 491–494, 62 S.Ct. 402, 86 L.Ed. 363; International Salt Co., Inc. v. United States, 1947, 332 U.S. 392, 397–398, 68 S.Ct. 12, 92 L.Ed. 20.

44. Workmen's Compensation & Insurance, California Labor Code, Section 3201 et seq.

45. California Labor Code, § 5705(a); Riskin v. Industrial Accident Commission, 1943, 23 Cal.2d 248, 254–255, 144 P.2d 16. And see, Scott v. Pacific Coast Borax Co., 1956, 140 Cal.App.2d 173, 178–179, 294 P.2d 1039, interpreting the words "arising out of employment" or "in the course of employment". California Labor Code, §§ 3600–3601. The difficulties which might arise if an employee is loaned to another is illustrated in a noted California case in which the fact of injury by one in the employment of another employer was concealed from the employee. The employee was permitted to sue the special employer, after

More, I am of the view that more recent cases have sustained agreements of this character involving "package" deals which give price advantages to customers where the field is open to others and there is no intention to exclude or monopolize.[46] These cases revive the doctrine that mere price advantage which does not involve the monopoly of a substantial portion of commerce is not illegal.[47] This principle was given recognition recently by our Court of Appeals in a case in which the Court, speaking through Stephens, Chief Circuit Judge, stated:

"The mere fact that an owner of a patented article combines the article with an unpatented article and sells or leases the unit as a whole does not per se prove misuse. The holder of a patent can exploit his legally protected monopoly in the patent as best he sees fit, so long as in doing so he does not restrain competition in the unpatented article."[48]

## VI

### Infringement

It follows that none of the special defenses is valid. That the defendants' device infringes cannot be questioned. In one of their own operating manuals the defendants describe their tool in this manner:

"The Dia-Log Free Point Indicator is an electrical strain gauge lowered on a conductor cable in an oil well to measure stretch and torque movement in drill pipe, tubing, and casing. The tool assembly as run in the well comprises three sections: (1) the weights, (2) the jar section, and (3) the tool itself consisting of the lower centralizing springs, the strain gauge element, and the upper centralizing springs.

"Usually three lead filled weights having a central electrical conductor are placed above the tool to force it down the pipe against the friction of the centralizing springs. Each weight, 1⅝" in diameter and five feet long, weighs forty-five pounds.

"The jar section has a one foot stroke which separates the strain gauge element and centralizing springs from the conductor cable and weights as the pipe is stretched. Overall length of the tool is 9½ feet with the jars closed and 10½ feet with the jars open.

"The two sets of adjustable centralizing springs are spaced 52 inches apart. Weight of the tool is sixteen pounds. Each set of springs will hold approximately twenty pounds, and thus if the two sets are properly adjusted, they will support more than twice the weight of the tool without slipping. Coil springs in combination with the centralizing springs permit the tool to pass through small openings and still hold in larger pipe. For example, with springs set to hold in 4½ inch drill pipe, the tool will still pass through and hold in 2 inch I.D. drill collars. Maximum diameter of the tool is 1⅝ inches and the smallest opening through which it will pass is 1¾ inches.

"As a length of pipe is stretched or torqued, there is an approximately uniform stretch or angular deflection for any unit length. The Free Point Indicator strain gauge element measures the stretch or angular deflection of the 52 inch section

discovering the concealment. Kimball v. Pacific Gas & Electric Co., 1934, 220 Cal. 203, 30 P.2d 39.

46. Times-Picayune Co. v. United States, 1953, 345 U.S. 594, 624–626, 73 S.Ct. 872, 97 L.Ed. 1277; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 1957, 247 F.2d 343, 357–358. See,

Cutter Laboratories, Inc. v. Lyophile-Cryochem Corp., 9 Cir., 1949, 179 F.2d 80, 92–94.

47. Whitwell v. Continental Tobacco Co., 8 Cir., 1903, 125 F. 454, 459–461.

48. Stearns v. Tinker & Rasor, 9 Cir., 1958, 252 F.2d 589.

of pipe between the two sets of centralizing springs."

It is admitted that this device *achieves the same result* as the patented devices. Identity of result alone is, of course, not sufficient to invalidate a patent, if it is secured by different means which are not equivalents.[19] However, here the means used are either identical or clearly within the range of equivalence of what we have declared to be a pioneer or generic patent.

### A. Identity of Structure

The defendants' device contains two anchor members, belly springs, connected by a slip joint which permits the two members to freely move apart without resistance. They can be freely rotated, one with reference to the other and they can be easily separated. While the structure is not lowered into the well by a cable it is so lowered by weight under the force of gravity so that it comes to a selected position within the well. There are means which are responsive to the relative movement of the two anchor members for imparting to an operator outside the well an indication of the relative movement.

These are all elements of Claim 10 of Martin '308 which read upon the defendants' structure. The same is true of Claim 6 of Martin '309. For the accused device has two anchor members, the belly springs, which are connected together for relative movement, and are so connected to the pipe within the well that movement in that part of the well will produce relative movement between the two anchor members. The accused device has inductance inclined pole face type elements connected with one of the anchors in close relation to it. That is the armature disposed in movable relation to the winding, one connected with the lower anchor being the armature and the other being the electric core connected with the upper anchor, and the slip joint connection between the two

anchor members permits variation of the two elements, so that the change in electrical impedance within the gauge gives an electrical current flow indicative on the meter at the surface of the ground of the movement of the members. When the inductance inclined pole faces of the defendants' structure move apart by the separation of the anchor means to vary the air gap between the inclined pole faces, the result is to produce an electrical change which is as defined in these claims.

Without going into greater detail we state that we find the same similarity between the Brookes patent and the defendants' device. The claimed distinction between the two arising from the use of belly springs instead of the anchors, means little unless it is shown that defendants conceived the idea of the use of the belly spring before Brookes taught it to the art. If they did not, they are infringing, notwithstanding change of form.

### B. Operation and Result

The operation of the accused device, —which correctly describes the function of the tool in such manner as to show the identities which spell infringement, —may be summed up in this manner: There is a line on the wired truck, connected at the surface of the earth to a meter, which supports the down hold instrument. The top of the unit ("The Dia-Log-Free Point Indicator") consists of weights and two driller jars. The weights have a conductor running through the center and there is a slip joint immediately above at the top of the tool referred to as "tubular jars" in the defendants' catalogue drawing. When they start into the well with the tool there is at the top of the tool a set of belly springs or anchor members. Immediately below, there is an electronic indicating element which is located between the two belly spring assemblies. Below the sensing element is another set of belly springs. When the tool is low-

49. Air Devices v. Air Factors, Inc., 9 Cir., 1954, 210 F.2d 481, 483. And see cases cited in Note 19; Swan Carburetor Co. v. Chrysler Corp., 6 Cir., 1942, 130 F.2d 391, 393.

ered into the well gravity holds it in the well. When the desired point to be checked is reached the weights are released from the top of the tool and the two members anchor the tool in place. Then a stretch or torque is applied to the pipe. And if the two anchor members change in relation to each other, the induction in the coil is changed and it becomes electrical energy, which is recorded at the surface. Otherwise put, when the inductive gap is opened by either stretch or torque the impedance of the inductor is changed. The change affects the electrical current flow through the variable inductor, which is the sensing element in the tool, and, on being measured at the surface, informs the operator whether the pipe is free or stuck at the point.

It follows that there is identity of function, relationship of parts, mode of operation and results.[50] There is evidence in the record that the device of the defendants *can be and has actually been, used in situations where the plaintiff's devices cannot be used or where they actually failed,* because the defendants' device is in "continuous engagement" with the pipe. Assuming that this is the fact and that it is due to an improvement which the defendants made, they are not entitled to use the basic patent without the payment of a royalty.[51]

Judgment will therefore be for the plaintiff, the exact terms to be contained in a separate decision filed herewith.

50. A case which arose in the 7th Circuit has a very important bearing upon this phase of the case. The patent related to a slug rejecting device. The infringing device modified a previous model which had been held to infringe the patent by causing the finger instead of the cradle projection of the device to move when it was necessary that one of two move while the other be fixed. This departure was held a mere transposition of motion of cooperating parts of the device. We quote in full this portion of the opinion:

"In the later models defendant has so arranged the parts as to move laterally, during the operation of rejection of the under-weighted coin, the arm or finger of Claim 21, instead of the cradle projections themselves, in order to remove the intercepted coin and cause it to drop down the rejection passage, the pathway for the rejected slugs. In other words, the *stripping finger is moved instead of the cradle, which remains fixed. Thus, in one device, the cradle moves; in the other, the finger. In both, however, they must act in co-operation. There is no difference in results. The operation necessarily requires that one element remain fixed and the other move. We cannot see that it involved any conception of a different mechanical principle or method of operation to make the moving part the finger instead of the cradle.* In other words, the movement of each toward or away from the other must be relative as to each other, such as makes it possible that both move transversely to each other or that either one be fixed and the other movable. This, we think, is a mere transposition of motion of cooperating parts of the devices of the patent, equal to and corresponding with what the patent prescribed, within the purview of the courts' decisions in Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 40–43, 50 S. Ct. 9, 74 L.Ed. 147; Blake v. Robertson, 94 U.S. 728, 24 L.Ed. 245; Tratsch v. Chicago Lock Co., 7 Cir., 72 F.2d 482, 485. This court said, in the last mentioned case: 'The only question presented, therefore, is whether appellant avoids infringement by placing the abutment member P and S 1 on the slide instead of on the guide, and by forming the elongated slot D in the guide instead of the slide, and we are convinced that the question must be answered in the negative. In appellant's devices there is *a mere reversal or transposition of parts used in the patent, but they produce the same functions in substantially the same way, and accomplish the same result as the patent.'* The language quoted is directly applicable to the devices held not to infringe." National Rejectors, Inc. v. A.B.T. Mfg. Corp., 7 Cir., 1951, 188 F.2d 706, 708–709. (Emphasis added.)
And see, Brown v. Brock, 4 Cir., 1957, 240 F.2d 723, 728.

51. See cases cited in Note 29.

Nov. 14, 1950 2,530,308

P. W. MARTIN

APPARATUS FOR DETERMINING MOVABILITY OF MEMBERS IN WELLS

Filed Sept. 28, 1945 2 Sheets–Sheet 1

*Fig. 1* *Fig. 2* *Fig. 3*

INVENTOR.

PHILIP W MARTIN

BY

ATTORNEY

Nov. 14, 1950

P. W. MARTIN

2,530,308

APPARATUS FOR DETERMINING MOVABILITY OF MEMBERS IN WELLS

Filed Sept. 28, 1945

2 Sheets—Sheet 2

INVENTOR.

PHILIP W. MARTIN

BY

ATTORNEY

Patented Nov. 14, 1950　　　　　　　　　　　2,530,308

# UNITED STATES PATENT OFFICE

2,530,308

## APPARATUS FOR DETERMINING MOVABILITY OF MEMBERS IN WELLS

Philip W. Martin, Huntington Park, Calif.

Application September 28, 1945, Serial No. 619,242

17 Claims. (Cl. 73—151)

**1**

My invention relates to a device adapted to be lowered into a well for determining relative movement between parts in the well or for determining whether a selected portion of a pipe in a well is movable by observing whether a change in the stress applied to the pipe produces a change in the form of the selected portion of the pipe in the well.

One important utility of the invention is to find the point in the well where a casing, drill pipe or tubing may be stuck by the measurement of the change in form of the casing, drill pipe or tubing when stress is applied thereto at the surface of the well or at a selected point within the well. A specific example of the utility of the invention is where a drill pipe becomes stuck in the well at an unknown distance below the surface of the ground. If a pull is applied to the upper end of the stuck pipe, there will be an extension or stretching of the pipe throughout the entire length thereof above the point in the well at which the pipe is stuck, but this pull upon the pipe will not produce an extension of that portion of the pipe which is stuck or which extends below the stuck part.

It is an object of the present invention to provide a device which may be lowered within the stuck pipe by which a workman at the top of the well may determine whether the portion of the pipe adjacent the device in the well moves or stretches when a pull is applied to the upper end of the pipe. By lowering the device throughout consecutive positions within the pipe the workman may make a number of observations of whether the pipe moves or stretches in response to a pull applied to its upper end. Through use of the device he will observe that the pull on the pipe will produce a stretch therein until the device reaches the point at which the pipe is stuck in the well, but at the stuck point and therebelow the device will produce no indication of stretch in the pipe, thereby indicating to the workman the point at which the pipe is stuck in the well. When this point is determined a cutting off tool may be lowered into the drill pipe and the drill pipe may be cut off at or immediately above the point at which it is stuck in the well; whereupon the portion of the drill pipe above the cut may be pulled from the well. In the foregoing manner a great deal of time in the recovery of drill pipe stuck in the well is saved, and the possibility of losing drill pipe in the well is minimized.

It sometimes occurs that a pipe, for example, the drill pipe, may become stuck in a well at an intermediate point, the portions of the drill pipe

**2**

above and below that portion which is stuck being free. It is possible by use of the invention to determine the length and position of that portion of the drill pipe which is stuck in the well. When this knowledge is obtained it will be possible, under some circumstances, to jar loose the portion of the drill pipe which is stuck by the firing of an explosive charge within the stuck portion; whereupon the drill pipe may be pulled from the well without the necessity of cutting it.

It is an object of the invention to provide a device which may be lowered through consecutive positions within a well, this device having an anchor member equipped with means for connecting or affixing it to a part in the well, the device also having means associated with the anchor member which will indicate relative movement of another part in the well. For example, in the preferred form of the invention the device is provided with an anchor member having means for attaching it to one part of a pipe in the well and a means which will indicate relative movement of another or adjacent part of this pipe when the value of the stress applied to the pipe is changed. It will be understood that when a pull is applied to the upper end of a pipe, the change in the stress applied to the pipe will produce an elongation or extensile change in form of the pipe, and that when the value of this stress is changed—for example, a decrease in the stress—the change in the form of the pipe will consist in contraction or shortening of all portions of the pipe in which the stress is relieved. Also, the stress applied to the pipe to deform the same may be torsional instead of tensile, under which circumstances all portions of the pipe between the stuck point and the point at which the stress is applied will deform in torsion or, in other words, twist, thereby changing the relation of consecutive portions of the pipe, such changes in relation being observed or indicated by the device. These changes in torsional relation will be indicated when the torsional stress is applied and when it is relieved.

A further object of the invention is to provide a device of the general character referred to in the foregoing having associated with the anchor means thereof a means which responds to relative movement or change in relative position of another part in the well to produce an indication of this relative movement, the invention having means for transmitting to a workman at the top of the well knowledge of the indication and therefore knowledge of the relative movement whereby the workman may determine whether the

2,530,308

**3**

stress applied at the top of the well has accomplished relative movement of the part to which the anchor is connected and another part adjacent thereto.

A further object of the invention is to provide a device of the character set forth in the preceding paragraph wherein the relative movement between parts in a well produces an electrical effect, which electrical effect is employed at the top of the well to produce an indication of the relative movement.

A further object of the invention is to produce a device of this character wherein relative movement between the parts in the well produces sound vibrations which are transmitted to the top of the well where they may be observed or recorded.

A further object of the invention is to produce a device of this character wherein relative movement of adjacent parts in the well is employed to change the resistance of an electrical resistance element which controls the electrical potential in a circuit which extends to the top of the well, there being means at the top of the well responding to the variations in the electrical potential of the circuit to produce a sensible indication of the relative movement of the parts in the well.

A further object of the invention is to provide a device of the character set forth in the foregoing having two relatively movable members or anchors, with means for connecting these members to separate parts in the well, so that relative movement of the parts in the well will produce relative movement of the members connected thereto, the device also having means for indicating to an operator at the top of the well relative movement of the members.

A further object of the invention is to provide a testing device of the character set forth herein having a normal form of electromagnet for producing attachment of one or more parts of the device to a metal wall, such as the metal wall of a pipe in the well, this electromagnet being of such slender form that the testing device may be made of a diameter which will pass through the opening through devices or tools such as are employed in wells, such, for example, as a spear, it being possible, therefore, to lock the spear to the pipe in the well so as to transmit force to the pipe and to lower the device into or through the spear for the purpose of making observations of relative movement of parts either above or below the point in the well where the pipe or an intermediate part of the pipe may be fixed against movement.

An important utility of the invention is to determine the length of pipe that is securely cemented in a well. In one of its forms the device employs only one magnet for attachment to the pipe in the well, there being a microphone connected to the device for picking up sound resulting from movement of the pipe in the formation.

Further objects and advantages of the invention will be brought out in the following part of the specification.

Referring to the drawings which are for illustrative purposes only,

Fig. 1 is a schematic view showing a preferred embodiment of my invention in a pipe which extends down into a well.

Fig. 2 is an enlarged sectional view of the upper portion of the device.

Fig. 3 is an enlarged sectional view of the lower portion of the device.

**4**

Fig. 4 is a section taken as indicated by the line 4—4 of Fig. 2.

Fig. 5 is a cross section taken as indicated by the line 5—5 of Fig. 2.

Fig. 6 is a cross section taken as indicated by the line 6—6 of Fig. 3.

Fig. 7 is a schematic view showing an alternative form of the invention.

As an example of the utility of my invention I have, in Fig. 1, shown a pipe 10 stuck in a well 11 at the height or position 12. The pipe 10 is representative of any member which may be employed in a well, movement of which within the well will impart to a workman information as to conditions within the well. For example the pipe 10 may be a casing, drill pipe or tubing. 10a may be referred to as the stuck portion of the pipe and 10b may be referred to as the free portion of the pipe. It will be understood that when the pipe is standing in the well without any pull exerted on its upper end, the lower part 13 of the free portion 10b will be under compression due to the weight of the pipe portion 10b extending upwardly therefrom, and that the upper part 14 of the free portion 10b will be substantially unloaded due to weight of the metal in the pipe. If a pulling stress is applied to the upper end of the pipe 10 which projects from the upper end of the well, the free portion 10b will be elongated an amount depending upon upward pull applied to the pipe. The unit change in form, or elongation, in the free portion 10b of the pipe will be substantially constant throughout its entire length for the reason that the change in stress applied to the pipe due to the upward pull thereon will be substantially the same throughout its entire length above the set portion 10a. That is to say, if an upward pull of 10,000 pounds is applied to the upper end of the free portion 10b, the change in stress throughout the entire length of the free portion 10b will be 10,000 pounds and therefore every portion of the pipe 10 above the stuck portion 10a will elongate due to the change in stress thereon.

The testing device 15, shown in Fig. 1, consists of vertically spaced upper and lower members 16 and 17 connected together by a slender tubular part 18 so that they may have relative movement, this device 15 being supported by a cable 19 so that it may be moved through consecutive positions within the pipe 10. As shown in Fig. 2, the lower end of the cable 19 is connected by a cable clamp 20 to the upper end of the member 16. The cable 19 has an insulated conductor 21 extending therethrough, the lower end 22 of the conductor 21 being connected to one side of a variable resistance element 23 which in the form of the invention disclosed consists of a microphone of standard type employing carbon granules as a variable resistance means. The opposite side of the resistance element or microphone 23 is connected through a fixed current limiting resistance 24 with the metal wall of the member 16, which member 16 is grounded to the cable 19.

The microphone 23 is carried within the upper cylindric body part 25. A pair of spaced bars 26 are connected by bolts 27 to the lower flattened extension 28 of the body 25. By bolts 29 the lower ends of the bars 26 are connected to the lower cylindric body 30 of the member 16, which body 30 has an axial opening 31 threaded at 32 to receive the upper end of the tubular connecting member 18. In the vertically elongated space 33 between the bars 26 there is a vertically elongated electromagnet 34.

2,530,308

The electromagnet 34, as shown in Figs. 2 and 5, has a vertically elongated soft iron core 35 of U-shaped cross section. As shown in Fig. 5, this core 35 disposed substantially on the center line of the tool and a pair of outwardly extending side plates 37 which project at 38 slightly beyond the cylinder defined by the outer curved surfaces of the side bars 26, so that these side plates 37 of the core 35 project slightly from the member 16 for engagement with the wall of the pipe into which the testing device is inserted. An electromagnet winding 39, in the form of a vertically elongated loop, is wound upon the base plate 36 of the core 35, as shown in Fig. 2, the vertical extension of the winding 39 extending respectively within the spaces provided between the side plates 37 of the core 35 and the side bars 26.

The lower member 17 of the device includes a similar electromagnet 34 and therefore the respective parts of this electromagnet 34 of the lower member 17 are designated by the same numerals as employed in conjunction with the upper electromagnet 34. The lower electromagnet 34 is held between side bars 26' of non-magnetic metal, such as brass or bronze, these side bars 26' being of identical form to the side bars 26, and being connected at their upper ends by bolts 27' to the upper cylindrical body portion 40 of the lower member 17, and being connected at their lower end by bolts 29 to the lower body 41. The upper cylindrical body 40 has an upwardly spaced opening 42, threaded at its upper end to receive an axially bored plug 43 through which the lower tubular part 44 of the connecting member 18 has limited sliding movement. The part 44 has an axial opening therethrough and at its lower end has a flange 45 which is disposed between upper and lower compression springs 46 and 47 which are received within the opening 42 below the plug 43. The springs 47 and 46 yieldably position the flange 45 in an intermediate position in the opening 42 so that the lower member 17 may have relative movement with respect to the upper member 16.

As shown in Figs. 3 and 6, the part 44 which passes through the plug 43 has a keyway 48 therein which is engaged by a yieldably supported key 49 positioned in a recess 50 in the plug 43 between a pair of compression springs 51, the outer end of the recess 50 being closed by a threaded plug 52. The purpose of the key 49 is to maintain the upper and lower magnets 34 in alignment when no torsional strains are produced between the upper and lower members 16 and 17, the key 49 being yieldably supported so that there may be torsional relative movement between the upper and lower members 16 and 17.

The plug 43 has an opening 53 in which a small body 54 is slidable, this body 54 having a needle 55 engaging the surface of the part 44, there being a spring 56 behind the body 54 for urging the needle 55 into engagement with the member 44. The surface of the member 44 adjacent the point of the needle 55 is roughened so that when there is relative movement between the part 44 and the lower member 17, resulting from relative movement of the upper and lower members 16 and 17, the needle 55 will slide over the roughened surface of the member 44 and produce vibrations which will be transmitted through the member 18 and the upper member 16 to the microphone, causing variations in the resistance of the microphone which will result in electrical fluctuations in the electrical circuit of which the microphone

23 is a part. It will be understood that either linear or torsional relative movement of the upper and lower members 16 and 17 will produce, through the action of the needle 55, sound vibrations which will be picked up by the microphone 23.

As shown in Fig. 1 the upper end of the cable wire 21 is connected through a conductor 57, an inductance 58 and a switch 59 with one terminal of a source of electric current shown as a battery 60. The other terminal of the battery 60 is connected to a conductor 61 with the upper end of the cable 19, the lower end of which is grounded to the metal wall of the testing device 15. As shown in Fig. 2 the lower end of the cable wire 21 is connected to a conductor 62 with the winding 39 of the upper electromagnet 34, and the upper winding 39 is connected with the winding 39 of the lower electromagnet 34 by a conductor 63, the opposite end of the lower winding 39 being connected, as shown in Fig. 3, to the grounded metal structure of the testing device 15 by a conductor 64. To the electric circuit described in the foregoing an indicating means responsive to electric effects is connected. This indicating means is shown as a sound reproducing means represented as a loud speaker 65. Other indicating means may be connected to the electric circuit outside the well, such other indicating means being shown as a sensitive recording meter 66.

A manner of use of the device 15 is illustrated in Fig. 1. By means of the cable 19 it has been lowered into the stuck pipe 10, and the position which it occupies, by way of example only, is with the lower member 17 adjacent the upper extremity of the set portion 10a of the pipe 10, and with the upper member 16 adjacent the lower end of the free portion 10b of the pipe. When the switch 59 is closed, current from the battery 60 will flow through the windings of the upper and lower electromagnets 34, causing the members 16 and 17 to become connected or attached to the adjacent portions of the pipe 10 through the action of the magnetic flux of the electromagnets 34 which pulls the electromagnets 34 laterally so as to produce pressural engagement of the edges of the plates 37 with the surface of the pipe 10 whereupon friction between these parts 37 and 10 will act when there is relative movement of the engaged portions of the pipe 10 to cause relative movement of the members 16 and 17. At the same time there will be a flow of current through the microphone 23 and the limiting resistance 24, so that whenever vibrations are transmitted to the microphone 23, fluctuations in the electrical circuit, including the conductors 57 and 61 of Fig. 1, will be produced and such fluctuations will be indicated to a workman at the top of the well either through sound reproduced by the loud speaker 65 or by fluctuations of the needle of the recording meter 66. It is evident that these fluctuations will vary in number in accordance with the magnitude of the relative movement of the members 16 and 17, since the greater the relative movement of the parts 16 and 17, the greater will be the number of vibrations produced by the scratching of the needle 55 on the surface of the part 44.

With the device 15 attached to the pipe 10 as shown in Fig. 1, an upward pull may be applied to the upper end of the pipe 10, causing a change in the stress applied through all portions of the free part 10b of the pipe. This will result in an elongation of the part of the pipe 10 between the

2,530,308

7

upper and lower members 16 and 17, and, since these members 16 and 17 are firmly attached to base portions of the pipe 10, there will be relative movement of the parts 16 and 17, resulting from upward movement of the member 16 with the part of the pipe to which it is attached, while the lower member 17 is maintained stationary. This will cause the member 44 to move relatively to the needle 55, and the movement of the needle 55 relatively to the roughened surface of the member 44 will produce sound vibrations which will be picked up by the microphone 23, causing fluctuations in the electrical potential of the circuit which includes the conductors 57 and 61, these fluctuations then being perceived by the indicating instrumentalities 65 and 66. This will indicate to the observer that at least one of the members of the device 15 is attached to a free portion of the pipe 10. A steel pipe, by upward pull applied to its upper end may be readily elongated .005 inches per lineal foot, thereby producing ample relative movement of the upper and lower members 16 and 17 which are attached to a free portion of the pipe for actuation of the device in the manner described in the foregoing. It will be understood that whenever the device 15 is attached to the free portion of the pipe 10b, twisting of the pipe portion 10b will result in relative movement of the members 16 and 17 and the production of an indication thereof by the instrumentalities 65 and 66 outside the well, thereby indicating to the observer that the device is connected to a free or movable portion of the pipe in the well. When the device is lowered to a position wherein the lower member 17 is below the upper margin of the set portion 10a, as shown in Fig. 1, there will be a reduction in the magnitude of the signal received at the surface and when the upper member 16 is below the upper margin of the set portion 10a of the pipe 10, there will be no relative movement of the members 16 and 17 when an upward pull is applied to the upper end of the pipe 10 and therefore no indication of relative movement will be received by the observer at the top of the well, thus indicating to him that the device is attached to a stuck, immovable portion of the pipe. Accordingly, by lowering the device through consecutive positions of attachment along the pipe 10, the workman may make consecutive observations and may determine the point at which the pipe is stuck in the well.

For certain types of tests the upper member 16 of the device may be used alone, the lower member 17 being disconnected and the conductor 63, Fig. 2, connected to ground by connecting it directly to the grounded metal structure of the upper member 16. When this upper member 16 is lowered into the well and is attached to a part in the well through the magnetic attraction of the electromagnet 34 therein, the microphone 23 will receive sound vibrations produced by relative movement of parts in the well. For example, the sound produced by movement of a pipe in the formation will be picked up by the microphone and the sounds will be reproduced by the ear phones 65.

From the foregoing it will be perceived that only one means of attachment to a metal part within the well need be employed in the practice of the invention. In Fig. 7 I show an alternative form of the invention wherein a single means of attachment is employed. This single means of attachment consists of an anchor member identified by the numeral 16' for the reason that

8

it may be an exact duplicate of the upper member 16 shown in Fig. 1. Projecting downwards from the member 16' there is an extension 70 having at its lower end means 71 for engaging a pipe wall 72 at a point spaced from the anchor member 16' and for scraping along the surface of the pipe wall 72 when the pipe wall is deformed. In Fig. 7 the electrical equipment associated with the testing device is shown schematically in external relation to the device. The anchor member 16' has an electromagnet 34 associated therewith of the character previously described, and associated with the means 71 at the lower end of extension 70 there is a variable resistance element which may consist of a microphone. A battery 60, a choke 58 and indicating devices 65' and 66' are in circuit with the elements 23 and 34, the device 65' being an indicator, such as a loud speaker, and the device 66' being a sensitive meter. When the anchoring member 16' is attached to the wall 72 of the pipe, elongation or torsional deformation of the wall 72 will cause the means 71 to move relatively to the portion of the wall 72 engaged thereby with a scratching or scraping action, such relative movement producing vibrations which in turn cause variations in the resistance of the resistance element 23, information of which is conveyed to the operator at the top of the well through the indicating devices 65' and 66'. When both of the parts 38 and 71 are above the stuck point the signal produced by the scratching action will be of maximum strength and duration, and as the device is progressively lowered from the position in which it is shown in Fig. 7, there will be a gradual decrease in the signal received at the top of the well, the signal ceasing entirely when both parts 38 and 71 are positioned below the stuck point, with the result that the decrease in the duration and strength of the signal is indicative of whether the device is above, straddling or below the stuck point.

I claim as my invention:

1. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; and means connected to said anchor member engaging and responding to relative movement of another part in the well to produce at the top of the well an indication of said relative movement.

2. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; means connected to said anchor member and responding to relative movement of another part in the well adjacent to said first part to produce an electrical effect of a magnitude corresponding to the magnitude of said relative movement; means for transmitting said electrical effect to the top of the well; and means responding to said electrical effect to produce an indication of said relative movement and its magnitude.

3. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; means connected to said anchor member and responding to relative movement of

2,530,308

another part in the well adjacent to said first part to produce sound vibrations; and means for conveying said sound vibrations to the top of the well so as to produce at the top of the well a sensible indication of said relative movement.

4. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; and means connected to said anchor member and responding to relative movement of another part in the well to produce at the tope of the well a sound which constitutes a sensible indication of said relative movement.

5. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; means connected to said anchor member and responding to relative movement of another part in the well adjacent to said first part to produce an indication of said relative movement; and means for transmitting to the top of the well a signal denoting said indication.

6. In a device of the character described, having parts adapted to be lowered into a well, the combination of: an anchor member; means for lowering the anchor member into the well; means operable to connect the anchor member to a part within the well; an electrical resistance means in the well in operative relation to said anchor member; means connected to said anchor member and responding to relative movement of another part in the well to change the value of said resistance means; an electrical circuit including said resistance means, said circuit extending to the top of the well; and means responding to changes in the electrical potential in said circuit to produce a signal indicative of said relative movement.

7. In a device of the character described, having parts adapted to be lowered into a well, the combination of: a pair of members connected together in movabe relation; an electromagnet on each of said members for causing its attachment to an adjacent metal wall in the well, each of said electromagnets consisting of a vertically elongated core of U-shaped cross section with a coil of wire wound thereon; means controlled from the outside of the well for energizing said electromagnets; and means responsive to relative movement of said members for imparting to an operator outside the well an indication of said relative movement.

8. In a device having parts adapted to be lowered into a well for determining whether a portion of a tubular member in the well is movable, the combination of: an attachment member; means for lowering the attachment member into the well; means operable to connect the attachment member to a part of said tubular member within the well; means connected with said attachment member and engaging another part of said tubular member in spaced relation to said first named part within the well; and means responsive to relative movement of said spaced parts of said tubular member in the well to produce an indication thereof.

9. In a device having parts adapted to be lowered into a well for determining whether a portion of a tubular member in the well is movable, the combination of: an attachment member; means for lowering the attachment member into said tubular member in the well; electrical means operable to connect the attachment member to a part of said tubular member within the well; and means carried by said attachment member for sensing relative movement of another part of said tubular member spaced from said first named part in the well, said sensing means comprising a member carried by said attachment member and brought into engagement with said other part of said tubular member when said electrical means is operated and having means for varying an electric value which means is sensitive to relative movement of said parts of said tubular member to produce a signal in response to such relative movement.

10. In a device having parts adapted to be lowered into a well for determining whether a portion of a tubular member in the well is movable, the combination of: a pair of members connected together in movable relation; means for moving said members down into the well to selected positions; means for connecting each of said members to a different part of a localized portion of said tubular member in the well; and means responsive to relative movement of said members for imparting to an operator outside the well an indication of said relative movement.

11. In a device having parts adapted to be lowered into a well for determining whether a portion of a tubular member in the well is movable, the combination of: a pair of members connected together in movable relation; means for moving said members down into the well to selected positions; electrical means for effecting engagement of said members with spaced portions of a localized section of said tubular member in the well; means controlled from outside the well for delivering electric current to said electrical means to actuate the same; and means sensitive to relative movement of said relatively movable members adapted to produce a signal as an indication of said relative movement.

12. In a device of the character described for determining whether a portion of a tubular member in a well is movable, the combination of: a device having spaced elements thereon for engaging spaced parts of a localized portion of the tubular member in the well when the device is lowered in the well; means for moving said device into selected positions in a well; means for bringing at least one of said elements into holding engagement with the tubular member within the well; and electrical means responding to change in the relative position of said parts as the result of change in the stress in said tubular member to indicate movability of said localized portion of said tubular member.

13. In means for determining the points at which a pipe is in free or stuck condition in a well, for use with a means for applying motion to a portion of the pipe spaced from the portion in the well at which the pipe is stuck so that motion will be produced in the pipe which is indicative of movability of the pipe: a member adapted to be lowered into the well; suspension means for moving said member from place to place in the well; means for effecting engagement of said member with the pipe in the well so that the said motion of the pipe will be transmitted to said member; signal producing means suspended by said suspension means and operatively connected to said member, said signal producing means having a part supported in movable relation to said member and engaging said pipe under influence of said engagement effecting means

**2,530,308**

so that movement of said member by said pipe will effect relative movement of said part and said member, said signal producing means operating in consequence of said relative movement to control an electrical value representative of said motion transmitted from said pipe to said member; means for transmitting said electrical value from said electrical means to the surface; and electro-responsive indicating means at the surface of the ground to receive said value and indicate movability of the portion of the pipe contiguous to said member.

14. In a testing device adapted to be lowered into a well for determining whether a portion of a member in the well is movable: an organization comprising relatively movable parts adapted to be lowered into the well; means for moving said organization in the well; means operative to support said organization in the well independently of said first named means and for effecting engagement of at least one of said parts with a selected portion of the member in the well so that movement of said portion will produce relative movement of said parts; means for controlling said independent supporting means while said organization is in the well and means responsive to said relative movement of said parts in the well to produce an indication of movement of said portion of said member.

15. In a device for determining which portions of a pipe stuck in a well are movable, an organization adapted to be lowered into said pipe to selected positions, said organization having at least one member adapted to engage a selected portion of said pipe and comprising: means operative to move said organization from place to place in the well; means for effecting engagement of said member with a selected portion of the pipe for supporting said member independently of said first-named means so that movement of said selected portion will be transmitted to and cause movement of said member; and electrical movement sensing means in said organization in the well, adapted to produce an electrical signal in consequence of said movement of said member, and means at the surface of the ground connected to said sensing means and adapted to indicate said signal.

16. In a device for determining which portions of a pipe stuck in a well are movable, an organization adapted to be lowered into said pipe to selected positions, said organization having at least one member adapted to engage a selected portion of said pipe and comprising: means operative to move said organization having a place in the well; means for effecting engagement of said member with a selected portion of the pipe and for supporting said member independently of said first-named means so that movement of said selected portion will be transmitted to and cause movement of said member; and electrical movement sensing means in said organization in the well, adapted to produce an electrical signal in consequence of said movement of said member.

17. Apparatus for ascertaining whether a pipe is free or stuck at various zones within a well comprising an attachment member, means for lowering said attachment member into a well, means for attaching said member to a pipe within the well for movement with the portion of the pipe to which the member is attached, electrical means carried by said member and responsive to movement of said member to effect a variation in an electrical value, and means for transmitting an indication of the variation in such electrical value to the surface of the earth.

PHILIP W. MARTIN.

REFERENCES CITED

The following references are of record in the file of this patent:

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 1,654,819 | Kinley | Jan. 3, 1928 |
| 2,040,874 | Pack | May 19, 1936 |
| 2,045,474 | Kemler | June 23, 1936 |
| 2,092,316 | Lane | Sept. 7, 1937 |
| 2,300,384 | Johnston | Oct. 27, 1942 |
| 2,396,935 | Walstrom | Mar. 19, 1946 |

160 F.Supp.—44½

Nov. 14, 1950

P. W. MARTIN

DEVICE FOR DETERMINING RELATIVE
MOVEMENTS OF PARTS IN WELLS
Filed Jan. 15, 1946

2,530,309

*Fig. 1*

*Fig. 2*

*Fig. 3*

INVENTOR.
PHILIP W MARTIN

BY

ATTORNEY

Patented Nov. 14, 1950 2,530,309

# UNITED STATES PATENT OFFICE

2,530,309

### DEVICE FOR DETERMINING RELATIVE MOVEMENTS OF PARTS IN WELLS

Philip W. Martin, Huntington Park, Calif.

Application January 15, 1946, Serial No. 641,279

11 Claims. (Cl. 73—151)

**1**

My invention relates to a device adapted to be lowered into a well for determining relative movement between parts in the well or for determining whether a selected portion of a pipe in a well is movable by observing whether a change in the stress applied to the pipe produces a change in the form of the selected portion of the pipe in the well. This application is a continuation-in-part of my co-pending application, Serial No. 619,242, filed September 28, 1945, for Method and Apparatus for Determining Movability of Members in Wells.

One important utility of the invention is to find the point in the well where a casing, drill pipe or tubing may be stuck by the measurement of the change in form of the casing, drill pipe or tubing when stress is applied thereto at the surface of the well or at a selected point within the well. A specific example of the utility of the invention is where a drill pipe becomes stuck in the well at an unknown distance below the surface of the ground. If a pull is applied to the upper end of the stuck pipe, there will be an extension or stretching of the pipe throughout the entire length thereof above the point in the well at which the pipe is stuck, but this pull upon the pipe will not produce an extension of that portion of the pipe which is stuck or which extends below the stuck part.

It is an object of the present invention to provide a device which may be lowered within the stuck pipe by which a workman at the top of the well may determine whether the portion of the pipe adjacent the device in the well moves or stretches when a pull is applied to the upper end of the pipe. By lowering the device throughout consecutive positions within the pipe the workman may make a number of observations of whether the pipe moves or stretches in response to a pull applied to its upper end. Through use of the device he will observe that the pull on the pipe will produce a stretch therein until the device reaches the point at which the pipe is stuck in the well, but at the stuck point and therebelow the device will produce no indication of stretch in the pipe, thereby indicating to the workman the point at which the pipe is stuck in the well. When this point is determined a cutting off tool may be lowered into the drill pipe and the drill pipe may be cut off at or immediately above the point at which it is stuck in the well; whereupon the portion of the drill pipe above the cut may be pulled from the well. In the foregoing manner a great deal of time in the recovery of drill pipe stuck in the well is saved, and the possibility of losing drill pipe in the well is minimized.

It sometimes occurs that a pipe, for example, the drill pipe, may become stuck in a well at an intermediate point, the portions of the drill pipe above and below that portion which is stuck be-

**2**

ing free. It is possible by use of the invention to determine the length and position of that portion of the drill pipe which is stuck in the well. When this knowledge is obtained it will be possible, under some circumstances, to jar loose the portion of the drill pipe which is stuck by the firing of an explosive charge within the stuck portion; whereupon the drill pipe may be pulled from the well without the necessity of cutting it.

It is an object of the invention to provide a device which may be lowered through consecutive positions within a well, this device having an anchor member equipped with means for connecting or affixing it to a part in the well, the device also having means associated with the anchor member which will indicate relative movement of another part in the well. For example, in the preferred form of the invention the device is provided with an anchor member having means for attaching it to one part of a pipe in the well and a means which will indicate relative movement of another or adjacent part of this pipe when the value of the stress applied to the pipe is changed. It will be understood that when a pull is applied to the upper end of a pipe, the change in the stress applied to the pipe will produce an elongation or extensile change in form of the pipe, and that when the value of this stress is changed—for example, a decrease in the stress—the change in the form of the pipe will consist in contraction or shortening of all portions of the pipe in which the stress is relieved. Also, the stress applied to the pipe to deform the same may be torsional instead of tensile, under which circumstances all portions of the pipe between the stuck point and the point at which the stress is applied will deform in torsion, or, in other words, twist, thereby changing the relation of consecutive portions of the pipe, such changes in relation being observed or indicated by the device. These changes in torsional relation will be indicated when the torsional stress is applied and when it is relieved.

A further object of the invention is to provide a device of the general character referred to in the foregoing having associated with the anchor means thereof a means which responds to relative movement or change in relative position of another part in the well to produce an indication of this relative movement, the invention having means for transmitting to a workman at the top of the well knowledge of the indication and therefore knowledge of the relative movement whereby the workman may determine whether the stress applied at the top of the well has accomplished relative movement of the part to which the anchor is connected and another part adjacent thereto.

A further object of the invention is to provide a device of the character set forth herein wherein the relative movement between parts in a well

3

produces a change in the resonance or impedance of an electrical circuit, which change is employed at the top of the well to produce an indication of the relative movement which may be observed by persons desiring the information.

A further object of the invention is to provide a device of the character set forth in the foregoing having two relatively movable anchors, with means for connecting the anchors to separate parts in a well, so that the relative movement of the parts in the well will produce relative movement of the anchors which in turn acts upon means for varying the characteristic or characteristics of an electrical circuit, such as phase shift, change in resonance or variations in impedance, these variations being observable by use of suitable instruments at the top of the well. Herein, the term "impedance" means inductance or capacitance.

A further object of the invention is to provide a testing device of the character set forth herein having a novel form of electromagnet for producing attachment of one or more parts of the device to a metal wall, such as the metal wall of a pipe in the well, for example, the electromagnet being of such slender form that the testing device may be made of a diameter which will pass through the opening through devices or tools such as employed in wells, making it possible to employ the invention in a well below a tool which is disposed in the well. For example, a pipe may be stuck in a well at an intermediate point and may be free below this point. In one use of the invention a spear may be locked to the pipe in the well so as to transmit force thereto, and a testing device incorporating the present invention may be lowered through the spear into a position below the spear and there utilized for the purpose of making observations of relative movement.

Further objects and advantages of the invention will be brought out in the following part of the specification.

Referring to the drawings which are for illustrative purposes only,

Fig. 1 is a schematic sectional view showing a preferred embodiment of the invention in a pipe and showing in schematic form the electrical constituents of the device.

Fig. 2 is an enlarged fragmentary sectional view of that portion of the device shown in Fig. 1, indicated by the dotted circle 2 therein.

Fig. 3 is a fragmentary section corresponding to Fig. 2 but taken at right angles thereto.

In Fig. 1 I have shown a portion of a pipe 10 which is stuck in a well 11 at 12. It will be understood that this pipe 10 may be any pipe which may become stuck in the well, but for the purpose of the present invention, it may be regarded as a part of a drill pipe. The portion 10a of the pipe 10 below the position indicated by the numeral 12 may be referred to as the stuck portion of the pipe; whereas, the upper portion 10b of the pipe 10 constitutes the free or unstuck portion. When this pipe 10 is standing in the well without any pull exerted on its upper end, the lower part 13 of the free portion 10b will be under compression due to the weight of the pipe portion 10b extending upwardly therefrom, this compression gradually diminishing toward the upper end of the free portion 10b of the pipe 10. If an upward pull is applied to the upper end of the pipe 10, the free portion 10b will be elongated, and this elongation will be substantially constant throughout the entire length of the free portion of the pipe for the reason that the change in stress ap-

4

plied to the pipe due to the upward pull thereon will be substantially constant throughout its free portion 10b. For example, if an upward pull of 10,000 pounds is applied to the upper end of the free portion 10b which is standing on the stuck portion 10a, the change in stress throughout the entire length of the free portion 10b will be 10,000 pounds and therefore every portion of the pipe 10 above the stuck portion 10a will elongate due to the change in stress.

In Fig. 1 I have shown a testing device which consists of vertically spaced upper and lower members 16 and 17 connected by a relatively slender tubular part 18 in such a manner that the parts 16 and 17 may have limited relative movement. The device 15 is lowered into the pipe 10 by a cable 19 which is connected at 20 to the upper end of the member 16. The members 16 and 17 have therein vertically elongated electromagnets 21 and 22 which may be made as disclosed in detail in my copending application, Serial No. 619,242, for Indicator Method and Apparatus, filed September 28, 1945, these electromagnets 21 and 22 having windings 23' and 24 respectively which may be connected in series with a source of direct current through a switch 25 and conductors 26 and 27, the conductor 26 having a choke 28 therein, the purpose of which will be later explained. When the device 15 is lowered into the well, closing of the switch 25 will result in energization of the electromagnets 21 and 22 so that they will, by magnetic attraction, attach themselves to the wall of the pipe 10 as shown in Fig. 1, thereby fixing the members 16 and 17 against movement relatively to the pipe wall.

In the lower end of the member 16 there is a chamber 30, into the lower part of which projects the upper portion of the connector 18. The connector 18 is fixed onto the upper end of the member 17 and has limited axial and torsional movement relatively to the member 16. As shown in Fig. 3, the member 18 projects through an opening 32 in the lower end of the member 16 and has in its surface longitudinal keyways 33 which are engaged by the inner ends of pins 34 which are resiliently mounted in plugs 35 threaded in diametrically opposed relation in the wall of the member 16 surrounding the opening 32. The pins 34 are shown resiliently mounted in the plugs 35 by means of rubber bodies 36. The member 16 may be moved a limited distance axially on the connecting member 18, the pins 34 at this time sliding in the key slots 33. Also, the member 16 may have limited rotation on the connecting member 18, in view of the fact that the pins 34 are resiliently supported, so that they may deflect laterally from their normal centralized positions.

As shown in Fig. 1, the invention includes a circuit wherein electrical flow is established, this circuit extending down within the well to the testing device 15 and having means associated therewith whereby relative movement between the parts 16 and 17 of the testing device 15 will produce a change in one or more of the characteristics of the electric flow through the circuit, such change being indicated by a suitable responsive instrument, such as a meter 38 at the top of the well. This circuit includes a source 40 of noncontinuous electrical potential such as an alternator, a conductor 41, resistor 42, conductor 43, which is connected to the conductor 26 and a conductor 44 which is connected to the conductor 27 of the direct current circuit, through which the windings 23 and 24 of the electromagnets 21

2,530,309

and 22 are energized. In the chamber 30 of the member 16 there is a variable inductance unit 46 having magnetic field elements 47 and 48, one of which is connected by supporting means 49 to the member 16 and the other of which is connected by supporting means 50 to the upper end of the connecting member 18 so that relative axial or torsional movement of the members 16 and 17 will produce like relative movements of the field pieces 47 and 48. The variable inductance unit 46 has a winding 51 which may be divided between the two field pieces 47 and 48, the ends of such winding 51 being respectively connected through conductors 52 and 53 with the conductors 26 and 27, so as to be thereby connected in series with the source of electrification 40. The choke 28 is for the purpose of preventing a flow from the alternator 40 through the direct current source DC. As shown in Fig. 1, the ends of the field pieces 47 and 48 are cut diagonally and are spaced so as to provide a small gap, the variations in the size of this gap producing variations in the inductance value of the unit 46 which is in circuit with the source 40, and therefore produces a change in current flow through the indicating circuit, which change may be observed by use of the meter 38. In view of the fact that the gap between the adjacent ends of the field pieces 47 and 48 is diagonal, the size of this gap will be varied either by axial or torsional relative movement of the members 16 and 17.

As shown in further detail in Figs. 2 and 3, the field pieces 47 and 48 are of horseshoe form, and the two sections of the winding 51, indicated as 51a and 51b, are disposed around the transverse portions of the horseshoe field pieces 47 and 48. The anchoring means 49 for the field piece 47, shown schematically in Fig. 1, comprises matching recessed parts 49a which by transverse bolts 55 are bolted against opposite faces of the field piece 47 in a position to surround the coil section 51a, and which are secured to the member 16 by screws 56. In a similar manner the anchoring means 50 for the piece 48, shown schematically in Fig. 1, consists, as shown in Figs. 2 and 3, of matched recessed parts 50a bolted against opposite faces of the field piece 48 by transverse bolts 58 and secured to the upper face of the flange 59 at the upper end of the connecting member 18 by screws 60.

A rubber ring 61 is disposed between the lower face of the flange 59 and the annular shoulder 62 of the member 16 at the upper end of the opening 32 thereof, and resilient means such as rubber 63 is placed between the adjacent ends of the parts 49a and 50a which support the field pieces 47 and 48, the rubber elements 61 and 63 thereby producing yieldability between the members 16 and 17 in axial direction, and also permitting relative torsion between the members 16 and 17. In view of the connecting of the field pieces 47 and 48 respectively to the member 16 and to the connecting member 18 which is rigidly secured to the member 17, relative axial or torsional movement of the members 16 and 17 will vary the gap 65 between the field pieces 47 and 48.

The utility of the invention may be explained with reference to Fig. 1. By means of the cable 19 the device 15 has been lowered into the stuck pipe 10 to a position wherein the member 16 is disposed adjacent the lower portion of the free part 10b of the pipe and the member 17 is in the upper part of the stuck portion 10a. When the switch 25 is closed, current from the direct current source will flow through the windings of the upper and lower electromagnets 21 and 22, causing the members 16 and 17 to become attached to the adjacent walls of the pipe 10 through the attractive action of the magnetic flux of the electromagnets. The source of alternating, or pulsating if desired, current 40 is then employed to produce an electrical flow through the winding 51 of the unit 46, one or more of the characteristics of this electrical flow being observed at the top of the well. For example, the current strength or potential may be observed by use of the meter generally indicated at 38.

With the device 15 attached to the pipe 10, as shown in Fig. 1, an upward pull or a torsional strain may be applied to the upper end of the pipe 10, causing a change in the stress applied through all portions of the free part 10b of the pipe. This will result in relative movements of the members 16 and 17 and relative movement between the field pieces 47 and 48 to change the gap therebetween, which change in the size of the gap will produce a change in the inductance-impedance or capacity of the unit 46 to change at least one characteristic of the electrical flow in the indicating circuit, which may be observed by use of suitable instruments at the top of the well. For example, if the alternator 40 is of mechanical type, the variable inductance 46 will produce a change in the current strength which will be indicated by the meter 38. If the source 40 consists of a thermionic tube oscillator, the variable impedance unit 46 may be employed to vary the frequency of the oscillator, this variation or change being indicated by a frequency meter.

Either of the foregoing types of indications will inform the observer that at least one of the members 16 or 17 of the device 15 is attached to a free portion 10b of the pipe 10. As long as the device is attached to the pipe 10 above the stuck portion 12, application of stress to the upper end of the pipe will produce relative movement of the members 16 and 17, but when the entire device 15 is lowered into the stuck portion 10a of the pipe, relative movement of the members 16 and 17 will not be produced; therefore, the operator by making consecutive tests down through the pipe 10 may determine the point at which it is stuck in the well. A steel pipe, by upward pull applied to its upper end, may be readily elongated .005 inch per lineal foot, thereby producing ample relative movement of the upper and lower members 16 and 17 attached to a free portion of the pipe for actuation of the device in the manner described in the foregoing.

Another change in a characteristic of the current flow in the indicating circuit is that which is produced by iron core saturation or near saturation. In the device shown there is a direct current potential through the coils 51a and 51b to impress a magnetic flux on the iron core structure consisting of the parts 47 and 48. If this flux is brought to a high level, harmonics will be produced in the current flow of the indicating circuit, which harmonics may be measured or indicated at the top of the well by use of a voltmeter at 38 sensitive to one or more of the harmonic frequencies developed in the indicating circuit. The change in the gap between the parts 47 and 48 will vary the flux strength or concentration in the iron core, and thereby produce a change in the harmonic frequencies developed.

2,530,309

**7**

I claim as my invention:

1. In a device for obtaining from a well information of the movement of parts therein, the combination of: a pair of members connected together in movable relation and adapted to be lowered into the well; means operable to produce such engagement of said members with separate parts in the well that relative movement of said parts will cause relative movement of said members; conductors forming an electric circuit having a part thereof supported in close relation to one of said members; energizing means for producing a fluctuating electrical flow in said circuit; current control means separate from said energizing means connected to said members so that relative movement of said members will cause relative movement of portions of said current control means and responding to relative movement of said members to change at least one of the characteristics of the electrical flow in said circuit; and means having an indicator at the top of the well coupled to said circuit and adapted to respond to said change in said electrical flow in said circuit and thereby indicate relative movement of said members.

2. In a device for obtaining from a well information of the movement of parts therein, the combination of: a pair of members connected together in movable relation and adapted to be lowered into a well; electromagnetic means operable from the top of the well to produce such engagement of said members with separate parts in the well that relative movement of said parts will cause relative movement of said members; conductors forming an electric circuit extending down from the top of the well and connected to said electromagnetic means for energization thereof and having a part thereof supported in close relation to one of said members; means for producing a fluctuating electrical flow in said circuit; current control means connected to said members so that relative movement of said members will cause relative movement of portions of said current control means and responding to relative movement of said members to change at least one of the characteristics of the electrical flow in said circuit; and means having an indicator at the top of the well coupled to said circuit and adapted to respond to said change in said electrical flow in said circuit and thereby indicate relative movement of said members.

3. In a device for obtaining from a well information of the movement of parts of an iron or iron alloy tube extending in the well, the combination of: a pair of members connected together in movable relation and adapted to be lowered into the well; electromagnetic means operable from the top of the well acting by magnetic attraction of at least one of said members to at least on part of said tube to produce such frictional engagement of said members with separate parts of said tube in the well that relative movement of said parts will cause relative movement of said members; conductors forming an electric circuit having a part thereof supported in close relation to one of said members; means for producing a fluctuating electrical flow in said circuit; current control means connected to said members so that relative movement of said members will cause relative movement of portions of said current control means and responding to relative movement of said members to change at least one of the characteristics of the electrical flow in said circuit; and means having an indicator at the top of

**8**

the well coupled to said circuit and adapted to respond to said change in said electrical flow in said circuit and thereby indicate relative movement of said members.

4. In a device for obtaining from a well information of the movement of parts of an iron or iron alloy tube extending in the well, the combination of: a pair of members connected together in movable relation and adapted to be lowered into the well; electromagnetic means operable from the top of the well acting by magnetic attraction of at least one of said members to at least one part of said tube to produce such frictional engagement of said members with separate parts of said tube in the well that relative movement of said parts will cause relative movement of said members; conductors forming an electrical circuit extending from the top of the well and connected to said electromagnetic means for electrical energization of the same, said circuit including an inductance supported by one of said members; means for producing fluctuating current electrical flow in said circuit; armature means positioned in such relation to said inductance that its movement will produce a change in a characteristic of the electrical flow in said circuit; means connecting said armature means to at least one of said members so that relative movement of said members will produce said movement of said armature means; and means having an indicator at the top of said well coupled to said circuit adapted to respond to said change in a characteristic of the electrical flow in said circuit and thereby indicate said relative movement of said members.

5. In a device for obtaining from a well information of the movement of parts of an iron or iron alloy tube extending in the well, the combination of: a pair of members connected together in movable relation and adapted to be lowered into the well; electromagnetic means operable from the top of the well acting by magnetic attraction of at least one of said members to at least one part of said tube to produce such frictional engagement of said members with separate parts of said tube in the well that relative movement of said parts will cause relative movement of said members; means operable from the top of the well for energizing said electromagnetic means; conductors forming an electrical circuit extending from the top of the well, said circuit including an inductance supported by one of said members; means for producing fluctuating current electrical flow in said circuit; armature means positioned in such relation to said inductance that its movement will produce a change in a characteristic of the electrical flow in said circuit; means connecting said armature means to at least one of said members so that relative movement of said members will produce said movement of said armature means; and means having an indicator at the top of the well coupled to said circuit adapted to respond to said change in a characteristic of the electrical flow in said circuit and thereby indicate said relative movement of said members.

6. In a device of the character described, for obtaining information from a well of movement of parts in the well, the combination of: a pair of members connected together in movable relation and adapted to be lowered into a well; means for connecting each of said members to separate parts in a well so that movement of said parts will produce relative movement of

## 9

said members; means forming an electrical circuit having a winding supported in close relation to one of said members; an armature disposed in movable relation to said winding; means for producing a fluctuating current flow in said circuit; means connecting said armature and one of said members so that relative movement of said members will cause relative movement of said armature and said winding and thereby change at least one of the characteristics of said current flow; and means at the top of the well adapted to act in response to said change in said current flow and indicate said relative movement of said members.

7. In a device of the character described, for obtaining information from a well of movement of parts in the well, the combination of: a pair of members connected together in linearly and torsionally movable relation and adapted to be lowered into a well; means for connecting each of said members to separate parts in a well so that movement of said parts will produce relative movement of said members; means forming an electrical circuit having a winding supported in close relation to one of said members; magnetic field means for said winding having a gap, said field means being disposed so that said gap will be varied by linear and torsional relative movement of parts of said field means defining said gap; means for producing a fluctuating current flow in said circuit; means connecting said members and said field means and responsive to relative movement of said members for producing relative movement of said parts of said field means so as to vary the gap therebetween and thereby change at least one of the characteristics of said current flow; and means at the top of the well adapted to act in response to said change in said current flow and indicate said relative movement of said members.

8. In a device for determining the point at which a tube is stuck in a well: a pair of members connected together in movable relation and adapted to be lowered into the well; means for supporting said members in the well adjacent a selected portion of said tube; means operatively connected to said members and operating in consequence of relative movement of spaced parts of said selected portion of said tube to produce relative movement of said members; conductors forming an electric circuit having a part thereof supported in close relation to one of said members; means for producing a fluctuating electrical flow in said circuit; current control means having relatively movable portions and means connecting said portions respectively to said members so that relative movement of said members will cause relative movement of said portions of said current control means and responding to relative movement of said portions to change at least one of the values of the electrical flow in said circuit; and means having an indicator at the top of the well coupled to said circuit and adapted to respond to change in at least one of the values of said electrical flow in said circuit and indicate relative movement of said members.

9. In a device for determining the point at which a tube is stuck in a well: a pair of members connected together in movable relation and adapted to be lowered into the well; suspension means for moving said members in the well to a position adjacent a selected portion of said tube; means operating independently of said suspension means to support said members; means operating in consequence of relative movement

## 10

of spaced parts of said selected portion of said tube to produce relative movement of said members; conductors forming an electric circuit having a part thereof supported in close relation to one of said members; means for producing a fluctuating electrical flow in said circuit; current control means comprising impedance means coupled to said circuit and connected to said members so that relative movement of said members will cause change in the value of said impedance means; and means having an indicator at the top of the well coupled to said circuit and adapted to respond to said change in the value of said impedance means as evidenced by said electrical flow in said circuit so as to indicate relative movement of said members.

10. In a device of the character described, for use with a circuit which extends down into a well and means for producing a fluctuating electrical flow in said circuit: a pair of members connected together in movable relation and adapted to be lowered into the well; means operable to produce such engagement of said members with separate parts in the well that relative movement of said parts will cause relative movement of said members; and variable inductance means arranged for coupling to said circuit, said inductance means having relatively movable elements, at least one of which elements comprises a winding, and one of said elements being connected to one of said members and another of said elements being connected to the other of said members, to effect relative movement of said elements and variation of said inductance means in consequence of relative movement of said members.

11. In a device of the character described, for use with a circuit which extends down into a well and means for producing a fluctuating electrical flow in said circuit: a pair of members connected together in movable relation and adapted to be lowered into a well; means for moving said members in the well to a position adjacent a selected portion of a tube in said well; means operating independently of said first named means to support said members; means operating in consequence of relative movement of said selected portion of said tube to produce relative movement of said members; and current control means comprising a variable inductance means arranged to be coupled to said circuit and connected to said members so that relative movement of said members will cause a change in the inductance of said variable inductance means, as an indication of movement of said selected portion of said tube.

PHILIP W. MARTIN.

### REFERENCES CITED

The following references are of record in the file of this patent:

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 1,654,819 | Kinley | Jan. 3, 1928 |
| 1,889,730 | Lake | Nov. 29, 1932 |
| 2,045,474 | Kemler | June 23, 1936 |
| 2,180,175 | Sivertsen | Nov. 14, 1939 |
| 2,231,702 | Burgwin et al. | Feb. 11, 1941 |
| 2,275,532 | Lamberger et al. | Mar. 10, 1942 |
| 2,300,384 | Johnston | Oct. 27, 1942 |

FOREIGN PATENTS

| Number | Country | Date |
|---|---|---|
| 139,211 | Great Britain | Sept. 23, 1920 |

May 1, 1951 N. BROOKES 2,550,964
 DEVICE FOR DETERMINING POINT AT WHICH
 PIPE IS STUCK IN A WELL
 Filed Oct. 1, 1948

Fig. 1

Fig. 2

Fig. 3

INVENTOR
NORMAN BROOKES
BY
ATTORNEY

Patented May 1, 1951 · 2,550,964

# UNITED STATES PATENT OFFICE

2,550,964

## DEVICE FOR DETERMINING POINT AT WHICH PIPE IS STUCK IN A WELL

Norman Brookes, Bakersfield, Calif., assignor to McCullough Tool Company, Los Angeles, Calif., a corporation of Nevada

Application October 1, 1948, Serial No. 52,306

11 Claims. (Cl. 73—151)

My invention relates to a simple device for determining the point at which the pipe member, such as a string of tubing, drill pipe or casing, is stuck in a well, and utilizes the method disclosed in the application of Philip W. Martin, for Method and Apparatus for Determining Movability of Members in Wells, Serial No. 619,242, filed September 28, 1945 now Patent No. 2,530,308, wherein change in the relative positions of spaced portions of the tubular member in the well, when a force is applied to the upper end of tubular member, is used to produce an indication which is transmitted to the top of the well.

An important use of the invention is to quickly determine the point at which a drill pipe is stuck in a well so that the well driller may cut off the drill pipe at a point just above where it is stuck and pull the free portion of the drill pipe from the well. During the drilling of a well, various things may occur in the well which will cause the drill pipe to become stuck at some unknown point below the surface. For example a cave-in of the walls of the well may result in the pipe being gripped so tightly that it can not be moved. Also, if circulation of mud through the well is stopped for a period of time, settlement of solids may result in a gripping of the pipe so that a portion thereof is stuck. When a lower portion of the drill pipe becomes stuck in the well, is is advisable to remove the free portion of the pipe from the well as soon as possible so as to minimize the possibility of the pipe due to delay in removing the free portion, becoming stuck at a higher level. The present invention makes it possible to quickly determine the point at which the pipe is stuck in the well, or in other words, the lowest point at which the pipe is free in the well. This quickly-obtained information makes it possible to cut off the pipe at the lowest free point thereof with minimum delay.

It is an object of the invention to provide a device for determining the stuck point, or lowest free point of a pipe in a well having a pair of spaced expansible members adapted to be lowered into the pipe in the well, these members being connected by a structure formed so as to permit relative movement of the expansible members, which relative movement, in the preferred embodiment shown herein, is rotary. When the device is lowered into the well the expansible members engage spaced portions of the tight wall. A torque is applied to the upper end of the pipe to twist the same, and the expansible members of the device rotate relatively to each other or remain stationary depending upon whether the torque applied to the upper end of the pipe has produced relative rotation of the portions of the pipe engaged by the expansible members. It will be understood that when the torque is applied to the upper end of the pipe the length of the

pipe from the upper end thereof down to the stuck point will twist and that the applied torque will not twist the pipe below the stuck point. Therefore, the operator may lower the device described in the foregoing progressively down through the pipe in step-by-step order, applying a twist to the pipe as each new position of the device in the pipe is established, thereby determining in each position of the device whether or not twist applied to the upper end of the pipe has produced relative rotation of the expansible members of the device. When the device passes the stuck point and no rotation of the expansible members will occur when torque is applied to the upper end of the pipe and the operator will know that the portion of the pipe in which the device is then located is stuck, the alternative method and the operation of the device is to start the tests near the lower end of the drill pipe below the stuck point where no rotation of the expansible members of the device results when torque is applied to the upper end of the drill pipe, and carrying these tests consecutively upward until the device is brought into a position where torque applied to the upper end of the drill pipe produces relative rotation of the expansible members of the device.

It is an object of the invention to provide a device of the character described in the preceding paragraph having simple means for indicating relative rotary movement of the expansible members of the device, thereby imparting to an operator information that twist or relative rotation has occurred between the portions of the drill pipe engaged by the expansible members.

It is a further object of the invention to provide a device for determining the point at which a pipe is stuck in the well having a bar member which extends longitudinally within the pipe, this bar member having a pair of expansible cages thereon in spaced relation, at least one of these cages being turnable on the bar member. The bar member has a chamber containing an electro-responsive device which is actuated by the turning of the cage member which is turnable on the bar member and which varies an electrical characteristic or value in an electrical circuit which extends to indicating means, thereby making it possible to indicate that relative rotation of the cages has occurred. This device is lowered into the pipe which is to be tested, the expansible cages engaging spaced points vertically along the pipe. Torque is applied to the upper end of the pipe to produce a twisting force. If this twisting of the pipe produces relative rotation of the cages the operator of the device has knowledge that the portion of the pipe in which the device is located is not stuck. If, when torque is applied to the upper end of the pipe no rotation of the cages is indicated, the operator has knowledge that the

3

device is located in the pipe at a point below the place where the pipe is frozen or stuck in the well.

Further objects and advantages of the invention will be brought out in the following part of the specification.

Referring to the drawings which are for illustrative purposes only,

Fig. 1 is a fragmentary sectional view showing a portion of a pipe which is stuck in a well, with a preferred embodiment of my invention positioned therein;

Fig. 2 is an enlarged cross section taken as indicated in line 2—2 of Fig. 1;

Fig. 3 is an enlarged fragmentary cross section of the upper end of the device of Fig. 1, taken as indicated by the line 3—3 of Fig. 2.

In Fig. 1 I show a portion of a pipe 10, such as a portion of a string of drill pipe, extending in a well bore 11. This pipe 10 has become stuck by reason of the fact that the portion 12 of the earth wall of the bore 11 has closed in around the portion 13 of the pipe 10. Within the pipe 10 I show a torsion measuring or sensing device 14 comprising a pair of expansible members 15 and 16, secured in spaced relation and so as to be capable of relative rotation by a bar member 17 which may be solid or hollow in accordance with weight requirements. At the upper end of the bar member 17 there is a cable socket 18 from which a cable 19 extends, this cable extending over a pulley 20 disposed above the top of the well.

The expansible members 15 and 16 are both spring cages comprised of bow springs 21 positioned so that they will engage the internal surface of the pipe 10 as shown in Fig. 1, and establish a condition of frictional or movement transmitting engagement between the members 15 and 16 and spaced portions of the pipe 10. The cage 16 is fixed on the lower portion of the bar member 17 and the cage 15 is rotatable on the upper portion of the bar member 17.

As shown in Figs. 2 and 3, the upper end of the cage 15 comprises a collar 22 which is rotatable on the upper portion of the bar member 17 between a shoulder 23 and the lower end of the cable socket 18 which is threaded onto the upper end of the bar member 17. In the upper end of the bar member 17 there is a chamber 25 defined by a cylindric wall 26 having diametrically opposed openings 27 therein which are covered by the collar 22 of the cage 15. Sealing means such as sealing rings 28 are provided between the upper and lower end portions of the collar 22 and the cylindric wall 26 of the chamber 25 so as to guard the openings 27 against leakage of fluid from the exterior into the chamber 25.

Within chamber 25 there is an electrical control means 29 which is responsive to rotation of the cage 15 relatively to the bar member 17 and to the cage 16 which is fixed on the lower portion of the bar member 17. In the present form of the invention this electrical control means 29 comprises a variable inductance consisting of a U-shaped field piece 30 having downwardly extending legs 31 and the cross piece 32 on which an electromagnet coil 33 is wound. Between the lower ends of the legs 31 there is a bar armature 34 occupying a diametrical position within the chamber 25, as shown in Fig. 2.

The field piece 30 is fixed to the upper portion of the cylindric wall 26 by fittings 35 and the armature 34 is connected to the collar 22 of the cage 15 so that when there is relative rotation of the cage 15 and of the bar member 17 there will be likewise relative rotation of the field piece

4

30 and the armature 34. Connection of the armature 34 with the collar 22 is accomplished by use of set screws 36 which are threaded through the collar 22 and project through the openings 27 in the wall 26 into engagement with the opposite ends of the armature 34 as shown in Fig. 2. Locking screws 37 are disposed at the other ends of the set screws 36 after the set screws are adjusted into proper engagement with the ends of the armature 34. The ends of the armature 34 are connected respectively to the legs 31 of the field piece 30 by non-magnetic leaf spring members 39 which yieldably hold the armature 34 in spaced relation to the lower ends of the legs 31, as shown in Fig. 2. If rotation is applied to the cage 15 while the bar member 17 is held stationary, such rotation will be transmitted through the set screws 36 to the armature 34 and cause the same to rotate on the vertical axis of the chamber 25, thereby moving the ends of the armature 34 with relation to the lower ends of the legs 31, changing the inductance of the electrical control means 29. The control means 29 is coupled with a circuit comprising conductors 40 which extend through the cable 19 to the top of the well and are connectable by switch means 41 with an indicator 42 and means 43 for electrification of the circuit, such means 43 being shown as an oscillator. A feature of the invention is in the provision of an electrified circuit having an electrical flow, one of the values or measurable characteristics of which is varied as a result of relative rotation of the cages 15 and 16. For example, an oscillating current is passed through the circuit comprising the conductors 40. Any one of the changes in its characteristics as the result of the actuation of the control means 29 may be indicated by the device 42. For example, the indicating device 42 may respond to changes in wave form, phase, power factor, frequency, amperage or voltage. The control means 29, the indicator 42, and the described parts for operatively connecting them, form an indicating means for indicating relative movement of the expansible members 15 and 16.

In the use of the device, the organization 14 is lowered into the pipe 11 and when it is brought to rest in a desired position torque is applied to the upper end of the pipe 10. This torque or twist will produce torsional deformation of all portions of the pipe 10 between its upper end and its stuck portion 13. That is to say, throughout all portions of the pipe 10 above the stuck portion 13 thereof there will be a relative rotation of adjacent annular portions of the pipe 10, and since the cages 15 and 16 are in engagement with the spaced portions of the pipe 10, as shown in Fig. 1 which will transmit motion of the engaged portions of pipe 10 to the cages 15 and 16, this relative rotation of portions of the pipe 10 in response to torque will be transmitted to the cages 15 and 16, whenever the organization 14 is positioned with at least the cage 15 above the stuck portion 13. When the organization 14 is positioned so that both cages 15 and 16 are below the stuck portion 13, the application of twist to the upper end of the pipe 10 will not produce relative rotation of the cages 15 and 16 for the reason that the application of torque to the upper end of the pipe 10 will not produce torsional deformation of the pipe 10 below the stuck portion 13 thereof. The use of the device consists simply in the taking of readings with the organization 14 in different positions within the pipe 10 and observing when two adjacent

2,550,964

readings show a change from torsional deformation to non-torsional deformation of the pipe 10 as a result of the application of torque to its upper end, the stuck portion 13 of the pipe 10 being located between the positions of the organization 14, giving the readings referred to in the preceding sentence.

I claim:

1. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to frictionally engage the wall of the pipe and means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; conductors forming an electric circuit; means producing an electrification of said circuit; electrical control means connected to said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

2. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to frictionally engage the wall of the pipe and means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; conductors forming an electric circuit extending from the top of the well to said assembly; means producing an electrification of said circuit; electrical control means connected to said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means at the top of the well coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

3. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to frictionally engage the wall of the pipe and means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; conductors forming an electric circuit; means producing an electrification of said circuit; electrical control means connected to said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means at the top of the well coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

4. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced expansible members comprising bow springs to frictionally engage the wall of the pipe and vertically extending means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe, one of said members being rotatable relative to said vertically extending means; conductors extending in proximity to said assembly and forming an electric circuit; means producing an electrification of said circuit; electrical control means forming a part of said assembly and connected to said vertically extending means and one of said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

5. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced expansible members comprising bow springs to frictionally engage the wall of the pipe and vertically extending means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe, one of said members being rotatable relative to said vertically extending means; conductors extending in proximity to said assembly and forming an electric circuit extending from the top of the well to said assembly; means producing an electrification of said circuit; electrical control means forming a part of said assembly and connected to said vertically extending means and one of said members so as to be actuated in response to relative rotation of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative rotation of said members; and electro-responsive indicating means at the top of the well coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative rotation of said members.

6. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced expansible members comprising bow springs to frictionally engage the wall of the pipe and vertically extending means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; conductors extending in proximity to said assembly and forming an electric circuit extending from the top of the well to said assembly; means at the top of the well for producing an oscillating electric current flow in said circuit; electrical control means forming a part of said assembly and connected to said members so as to be actuated in response to relative rotation of said members, said control means having a variable inductance acting to change an electrical characteristic of said electrical flow when there occurs relative rotation of said members; and electro-responsive indicating means at the

2,550,964

**7**

top of the well coupled with said circuit comprising a meter operative to indicate said change in said characteristics of said electrical flow and thereby indicate that there has been a relative rotation of said members.

7. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced expansible members comprising bow springs to engage the wall of the pipe so that said members will be moved by movement of the portions of said pipe wall engaged by said bow springs and vertically extending means connecting said members so that they may be moved relatively to each other in response to deformation of the portion of the pipe between said bow springs, one of said members being movable relative to said vertical extending means; conductors extending in proximity to said assembly and forming an electric circuit; means producing an electrification of said circuit; electrical control means forming a part of said assembly and connected to said vertically extending means and one of said members so as to be actuated in response to relative movement of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative movement of said members; and electro-responsive indicating means coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative movement of said members.

8. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to engage the wall of the pipe so that said members will be moved by movement of the portions of said pipe which said members engage, and means connecting said members so that they may be moved relatively to each other in response to deformation of the portion of the pipe between said members when a deforming force is applied to the pipe; conductors forming an electric circuit; means producing an electrification of said circuit; electrical control means connected to said members so as to be actuated in response to relative movement of said members, said control means having parts acting to change an electrical characteristic of said electrification when there occurs relative movement of said members; and electro-responsive indicating means coupled with said circuit, operative to indicate said change in said characteristic of said electrification and thereby indicate that there has been a relative movement of said members.

9. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to engage the wall of the pipe so that said members will be moved by movement of the portions of said pipe which said members engage, and means connecting said members so that they may be moved relatively to each other in response to deformation of the portion of the pipe between said members when a deforming force is applied to the pipe; and indicating means for indicating relative movement of said members as the result of said deformation

**8**

of the pipe, said indicating means comprising one part connected to one of said members and another part connected to the other of said members so that there will be relative movement of said parts as the result of relative movement of said members, and means adapted to respond to relative movement of said parts and including means for registering said last named relative movement as an indication that there has been deformation of said portion of the pipe.

10. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having space expansible members comprising bow springs to engage the wall of the pipe so that said members will be moved by movement of the portions of said pipe wall engaged by said bow springs and vertically extending means connecting said members so that they may be moved relatively to each other in response to deformation of the portion of the pipe between said bow springs, one of said members being movable relative to said vertical extending means; and indicating means for indicating relative movement of said members as the result of said deformation of the pipe, said indicating means comprising one part connected to one of said members and another part connected to the other of said members so that there will be relative movement of said parts as the result of relative movement of said members, and means adapted to respond to relative movement of said parts as an indication that there has been deformation of said portion of the pipe.

11. In a device for determining the point at which a pipe is stuck in a well, the combination of: an assembly adapted to be lowered into the pipe, said assembly having spaced members expansible radially so as to engage the wall of the pipe so that said members will be moved by movement of the portions of said pipe which said members engage, and means connecting said members so that they may be relatively rotated around the axis of the pipe in response to torsional deformation of said pipe; and indicating means for indicating relative rotation of said members as the result of said deformation of the pipe, said indicating means comprising one part connected to one of said members and another part connected to the other of said members so that there will be relative movement of said parts as the result of relative rotation of said members, and means adapted to respond to relative movement of said parts as an indication that there has been deformation of said portion of the pipe.

NORMAN BROOKES.

REFERENCES CITED

The following references are of record in the file of this patent:

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 1,654,819 | Kinley | Jan. 3, 1928 |
| 2,078,426 | Sweet | Apr. 27, 1937 |
| 2,170,527 | Culbertson | Aug. 22, 1939 |
| 2,219,512 | Cooper et al. | Oct. 29, 1940 |
| 2,277,110 | Johnson | Mar. 24, 1942 |
| 2,300,384 | Johnston | Oct. 27, 1942 |

OTHER REFERENCES

Publication—"Instruments," vol. 20, July 1947, p. 638.